## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No.  08-167 (RJL)** |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM CORDOVA,** | : | |
| **also known as Centinella,** | : | |
| **also known as Mario,** | : | |
| | : | |
| **JOSE GUTIERREZ,** | : | |
| **also known Astuto,** | : | |
| **also known as Marco,** | : | |
| | : | |
| **WILLIAM OSORIO-RIVAS,** | : | |
| **also known as Macklin,** | : | |
| | : | |
| **MELVIN SORTO,** | : | |
| **also known as Killer,** | : | |
| **also known Fantasma,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this Omnibus Response to the defendants pre-trial motions.  In support of this response, the Government submits the following arguments and authorities and any other such arguments and authorities that may be cited at a hearing on this motion.

**I.      Procedural Background.**

1.      On June 10, 2008, a Federal Grand Jury sitting in the District of Columbia returned a nineteen count Indictment charging the defendants William Cordova, also known as Centinella,

also known as Mario (hereinafter "Cordova"), Jose Gutierrez, also known as Astuto, also known as

Marco (hereinafter "Gutierrez"), William Osorio-Rivas, also known as Macklin (hereinafter "Osorio-

Rivas"), and Melvin Sorto, also known as Killer, also known as Fantasma (hereinafter "Sorto"),

with, *inter alia*, Conspiracy to Commit Murder in Aid of Racketeering, Murder in Aid of

Racketeering, Assault with a Dangerous Weapon in Aid of Racketeering, Maiming in Aid of

Racketeering, Threatening to Commit a Crime of Violence in Aid of Racketeering, First Degree

(Premeditated) Murder, Assault with Intent to Kill while Armed, and other related offenses.  This

Court granted the government's motion, pursuant to the Speedy Trial Act, Title 18 United States

Code, Section 3161, to exclude the time under which this matter is to be taken to trial.  Trial in this

matter is scheduled to begin October 12, 2010.

## II.     The Violent Crimes Racketeering Conspiracy.

2.____The indictment in this matter is the result of a long term investigation into the violent

activities of a criminal organization that has operated in Washington, DC, Maryland, Virginia, and

elsewhere.  The four defendants are charged with conspiracy to commit violent crimes in aid of

racketeering, in violation of 18 U.S.C. § 1959(a)(5).  Count one of the indictment charges that, on

or about June 2006 and continuing through June 2007, the defendants were members and associates

of a criminal enterprise known as La Mara Salvatrucha 13 (hereinafter "MS-13") and that they

conspired to commit a variety of criminal activities including assaults, threats, extortion, witness

intimidation, aggravated assault, assaults with intent to kill, and murder in the District of Columbia,

Maryland, Virginia, and elsewhere.  (See Indictment 08-167, page 2, ¶ 1).  Count one further charges

that, as members and associates of MS-13, the defendants engaged in a variety of criminal activities

in furtherance of their MS-13 criminal enterprise.  Those criminal activities included, but were not

limited to, "jumping-in"[1] new recruits by physically beating new members, confronting, fighting, assaulting, and killing rival gang members, in Washington DC, Maryland, Virginia, elsewhere in the United States, and in foreign countries, including but not limited to, El Salvador.  (Id., page 2, ¶ 2, and  page 3 ¶ 3).

3.     Although the defendants are charged in the indictment with conspiring to commit violent crimes in furtherance of the MS-13 enterprise from June 2006 to June 2007, the indictment also charges that the MS-13 enterprise "operated in the District of Columbia since at least 2005," and that it "was established in El Salvador [but] . . . . has spread throughout the United States."  (Id., page 2, ¶ 2).

4.     As members of the MS-13 enterprise, the defendants advanced and promoted the objectives of the enterprise through, but not limited to, the following means and methods: intimidation, extortion, violence, and threats of violence, including murder and assault, in order to (i) preserve, expand, and protect the enterprise's territory and activities; (ii) promote and enhance the enterprise's prestige, reputation, and position in the community; (iii) promote a climate of fear; (iv) attack various individuals, including known and suspected members of rival gangs; (v) discipline enterprise members and associates who violated enterprise rules, (vi) punish enterprise members and associates who were disloyal to the enterprise; and (vii) use vehicles and firearms, and transport them in interstate commerce, to attend and promote enterprise activities.  (Id., page 5-6, ¶ 8).

5.     As a result of their membership and active participation in the MS-13 enterprise, the indictment, as mentioned *supra,* charges the defendants with committing various violent crimes in

---

[1]     Being "jumped-in" to MS-13 means having to endure 13 seconds of a physical beating at the hands of other MS-13 members.  This is an initiation practice.

aid of racketeering such as (i) the July 30, 2006, Assault with a Dangerous Weapon of Dennis Diaz-Gutierrez in Alexandria, Virginia; (ii) the April 22, 2007, murder of Edwin Ventura; (iii) the Assault with a Dangerous Weapon of Nelson Maldonado;[2] (iv) the threats to murder Feliciana Esquina-Flores; (v) the extortion of the Esquina-Flores family; and (vi) the June 1, 2007, maiming of Feliciana Esquina-Flores.  The defendants are also charged with committing various other weapons offenses.

## II.    The Evidence of Violence, Other Crimes and Bad Acts in Furtherance of the Conspiracy.

### A.    In El Salvador

6.    The government's evidence, by way of a cooperating witness, will expose that defendants Cordova and Gutierrez conspired often times with the cooperating witness to commit murders in furtherance of the MS-13 enterprise.  With respect to defendant Cordova, the evidence will expose that defendant Cordova was "jumped-in" to the MS-13 clique "San Cocos Locos Salvatrucha" (hereinafter SCLS) in 2002-2003.[3]  The evidence will further expose that in May of 2005, defendant Cordova and other members of MS-13 murdered a rival gang member.  Defendant Cordova was armed with an Uzi machine gun while the other members were armed with a .45 caliber and a .9 millimeter handguns.  Cordova and the other MS-13 members located a rival gang member, followed him to his residence, and shot him.  That same year, sometime in the middle of  2005,

---

[2]    Both Ventura and Maldonado were members of MS-13's rival gang Money Over Bitches, hereinafter referred to as MOB.

[3]    MS-13 is made up of numerous local factions called "cliques," that are spread across the United States and in foreign countries.  While local MS-13 cliques operate and manage themselves independently, all cliques have strong and mandatory allegiance to the MS-13 enterprise, with an enormous amount of allegiance to the MS-13 enterprise in El Salvador.

defendant Cordova and another MS-13 member murdered a rival gang member in an area near Sonsonate, El Salvador.  The murder was observed by local enforcement.  Cordova and the other MS-13 member fled and the officers gave chase.  The MS-13 member that was with Cordova was apprehended while Cordova made good his escape.  Defendant Cordova later fled to the United States to avoid prosecution.

7.     With respect to defendant Gutierrez, the government's evidence, by way of a cooperating witness, will expose that defendant Gutierrez was "jumped-in" to the MS-13 SCLS clique in 2004.  The evidence will further expose that, on one occasion,  defendant Gutierrez arrived to a location where MS-13 members had committed a murder to assist.  Upon his arrival, defendant Gutierrez put the decedent in the fetal position, placed him inside a black bag, and then left the body on the side of the street.  Defendant Gutierrez later fled to the United States to avoid prosecution.

**B.     In the United States**

8.     The government's evidence will expose that defendant Cordova arrived to the Washington DC area sometime in the spring to early summer 2006 and began living with the Esquina-Flores family.  Defendant Gutierrez arrived to the Washington DC area in early 2007 and also began living with the Esquina-Flores family.   Defendants Cordova and Gutierrez quickly associated themselves with local area MS-13 members.  Government witnesses will testify that they knew defendants Cordova and Gutierrez when they resided in El Salvador and that they knew Cordova and Gutierrez to be members of the MS-13 SCLS clique.  Cordova's and Gutierrez's SCLS clique had no local members in the DC area so they quickly aligned themselves with the DC based MS-13 Sailors clique.  Although Cordova and Gutierrez were not leaders of the MS-13 Sailors, they were allotted much respect by its members and instantly became enforcers because of the violence

they bragged about committing in El Salvador, see ¶¶ 5 and 6, *supra*.  Government witnesses will

testify that because of their strong allegiance to MS-13, and in particular MS-13 members from El

Salvador, many members of the MS-13 Sailors extended great respect to defendants Cordova and

Gutierrez due to them being "jumped-in" to MS-13 SCLS in El Salvador.

9.       Soon after his arrival to the Washington DC area, on July 30, 2006, defendant

Cordova and other members of MS-13, while armed with a firearm, shot at a car that contained

Dennis Diaz-Gutierrez, Josue Levia, and Jhosimar Alvarez-Torrez, in the City of Alexandria,

Commonwealth of Virginia.  Defendant Cordova and the other members of MS-13, believed the

occupants of the car were members of a rival gang.  During this shooting, Dennis Diaz-Gutierrez was

shot in the leg.  (See Indictment, Count 17).  The government's evidence will expose that after

committing this shooting, defendant Cordova regularly possessed a .40 caliber semiautomatic and

also a smaller  hand gun, and, that defendant Cordova often times possessed the hand guns while

attending MS-13 meetings.  At the meetings, defendant Cordova repeatedly ordered members of the

MS-13 Sailors to commit murders they way they had committed murders in El Salvador.  Defendant

Cordova told government witnesses that he had committed murder in El Salvador and that he was

on the run from the El Salvador police.  In addition, defendant Cordova threatened to harm an MS-13

associate and his family if anything happened to the guns.  While living with the Esquina-Flores

family, defendant Cordova often times brought other MS-13 gang members, many who had visible

MS-13 tattoos on the their bodies, to the Esquina-Flores residence.[4]

10.      In the fall of 2006, defendant Cordova was actively promoting increased violence and

---

[4]       Defendant Cordova also has the letters "MS" tattooed across his chest, on the
back portion of his neck, and the letters "SCLS" standing for his clique "San Cocos Locos
Salvatruchos" tattooed across his stomach.

testing the loyalty of the new MS-13 Sailors recruits.  For example, on three separate occasions,

defendant Cordova ordered an MS-13 recruit to get packages that were hidden in various parks

located in Washington DC.  On each occasion, the MS-13 recruit complied with the orders, picked

up the packages, and delivered them to defendant Cordova.  On two of the occasions, the packages

contained  marijuana and on the other occasion the package contained marijuana and a .38 caliber

handgun.  On each occasion, the MS-13 recruit saw the contents of the packages when delivered to

defendant Cordova and stood present as defendant Cordova examined the contents of each package.

Defendant Cordova threatened the MS-13 recruit with physical harm if the contents of the packages

were short.[5]

11.    Around this time period, defendant Melvin Sorto was the leader of the MS-13

Sailors.[6]  Government witnesses will testify that defendant Sorto carried "La Palabra" for the Sailors,

meaning he was the clique leader.[7]  In this role, defendant Sorto also promoted the increased level

of violence with Cordova and often times told other MS-13 Sailors that they had to represent the

"MS" letters in a higher capacity.  Both defendants Cordova and Sorto participated in the "jumping-

in," meaning the physical beating, of an MS-13 recruit.  In addition, defendant Sorto participated in

an assault on a rival gang member that occurred at a park near Sacred Heart Church, located in

Washington DC.  On that occasion, defendant Sorto and other members of the MS-13 Sailors

encountered members of rival gang MOB who were armed with baseball bats.  A physical assault

---

[5]    Due to serious witness security concerns, the name of the MS-13 recruit is not
listed.

[6]    Defendant Sorto also has MS-13 tattoos on his body.

[7]    The literal translation of "La Palabra" is the word.  This is MS-13 vernacular used
to identify a clique's leader.

between the two gangs followed.

12.     In late 2006 to early 2007, defendant Gutierrez arrived to the Washington DC area. Upon his arrival, defendant Gutierrez united himself with defendant Cordova and the MS-13 Sailors. Cordova and Gutierrez knew each other previously in El Salvador and were members of the same MS-13 SCLS clique.  The government's evidence will expose Cordova's knowledge that defendant Gutierrez was traveling to the United States and the plans Cordova made to accommodate the arrival of his fellow MS-13 SLCS gang member.  Soon after arriving, defendant Gutierrez attended MS-13 meetings and also promoted an increased level of violence.  Defendant Gutierrez told government witnesses that he had committed murder in El Salvador and was on the run from the El Salvador police.  Both Gutierrez and Cordova claimed their membership to "La Mara" or MS-13 in the presence of other MS-13 Sailors.  Gutierrez made clear his allegiance to MS-13 by bragging that he and defendant Cordova were going to do something different so that the local "Mara," meaning gang, could see how it was done.  In making this statement and others alike, defendant Gutierrez made known his intent to carry-out greater violence.  Defendant Gutierrez maintained a notebook that contained his MS-13 drawings.  Gutierrez maintained the notebook to display his artwork to fellow MS-13 gang members.  The members often times had Gutierrez tattoo MS-13 symbols on them. Defendant Gutierrez was observed by government witnesses in possession of hand guns as well.

13.     Throughout 2007, both defendants Gutierrez and Cordova lived with the Esquina-Flores family and threatened to murder Feliciana Esquina-Flores and her family.  (See Indictment, Count 11).  The two men extorted the Esquina-Flores family, stored weapons at the residence, and were in constant conflict with the family over rent money, food, and smoking marijuana in the Esquina-Flores home.  Defendant Gutierrez often times threatened an MS-13 recruit to be careful

about what the recruit said about, or did with, the guns that were stored at the Esquina-Flores residence.

14.     On April 22, 2007, shortly after midnight, defendants Cordova, Gutierrez, Osorio-Rivas, and Sorto conspired and planned to kill members of rival gangs: Latin Criminals, also known as LC (hereinafter referred to as LC), 14th Street, and MOB, in retaliation for earlier attacks on MS-13 members and associates.  In so doing, the defendants murdered Edwin Ventura, and shot and injured Nelson Maldonado, both members of rival gang MOB, (See Indictment, Counts 2 and 3). The government's evidence will expose that on the day before, on April 21, 2007,  MS-13 was engaged in a series of assaults with rival gangs.  The first assault occurred during the day when defendant Cordova and other MS-13 members were assaulted by a rival gang.  In this first assault, one of the MS-13 recruits was injured.  The second assault occurred later that evening when members of 14 Street were assaulted by MS-13.  In this second assault, one of the 14th Street members was injured.  The third assault occurred later that night when the members of MS-13 were assaulted by members of 14th Street in retaliation for the second assault.  In this third assault, no injures resulted but the assault prompted the immediate retaliation, that resulted in the eventual murder of Edwin Ventura and shooting of Nelson Maldonado, by defendants Cordova, Gutierrez, Osorio-Rivas, and Sorto.  Finally, the government's evidence will further expose that two days later, on April 24, 2007, MS-13 members were assaulted by members of 14th street in retaliation for the murder of Edwin Ventura.  In this fourth assault, MS-13 members were shot at but no injuries resulted.

15.     In the months following the murder of Edwin Ventura, defendants Cordova, Gutierrez, and Sorto continued to promote an increased level of violence by members of MS-13.

Defendants Cordova and Gutierrez continued to threaten to kill Feliciana Esquina-Flores and her family and they also continued to possess handguns.  As the conflict with the Esquina-Flores family escalated, Defendant Cordova told members of MS-13 that the orders from El Salvador were to kill Feliciana Esquina-Flores because she was a threat to MS-13.

16.      On June 1, 2007, defendants Cordova and Gutierrez carried out their threats on Feliciana Esquina-Flores.  Defendants Cordova, Gutierrez, and another MS-13 member drove up to Feliciana Esquina-Flores as she stood at a bus stop located on Georgia Avenue, NW, Washington.  Defendant Cordova emerged from the vehicle and shot Feliciana Esquina-Flores two times in the head.  Mrs.  Esquina-Flores survived the shooting but is now blind due to the gun shots.  (See Indictment, Count 10).

17.      On June 2, 2007, defendant Gutierrez was interviewed by detectives Emilio Martinez and Andre Marcucci of the Metropolitan Police Department's Gang Intervention Unit (MPD).  This interview was not video taped.  Although his interview was held at MPD's Third District Detective's Office, defendant Gutierrez was not placed under arrest.  During the interview, defendant Gutierrez admitted renting a room with co-defendant Cordova and Misael Esquina-Flores at the Esquina-Flores residence located at XXXXX Myrtle Avenue, NW, Washington DC.[8]  Defendant Gutierrez further admitted having trouble with the Esquina-Flores family due to back-rent that was owed and also that he had been asked to leave the residence.  Defendant Gutierrez admitted joining MS-13 in El Salvador and being a member of the gang but claimed that co-defendant Cordova and Misael Esquina-Flores were not full fledged members because that had not demonstrated their loyalty.

---

[8]      Throughout this interview and his post-arrest interview more fully detailed *infra*, defendant Gutierrez referred to Misael Giovanny Esquina-Flores by his middle name: "Giovanny."

When asked who would harm Feliciana Esquina-Flores, defendant Gutierrez said that perhaps law enforcement should direct their attention to her husband, Mr. Tomas Perez,[9] due to the problems the two had over infidelity.  Defendant Gutierrez also claimed to have overheard Feliciana Esquina-Flores' son, Misael Esquina-Flores, tell his mother that she would pay for doing this.  After providing his statement, defendant Gutierrez was released.

18.     Shortly after shooting Mrs. Esquina-Flores, defendants Cordova and Gutierrez fled the Washington DC area.  In their flight, the defendants traveled various states, including the states of New York and later North Carolina.  In New York, defendants Cordova and Gutierrez aligned themselves with NY MS-13 members and made known to them that they (defendants Cordova and Gutierrez) had "put in work" in Virginia and were on the run.  Cordova and Gutierrez admitted and bragged that they were on the run from El Salvador because of murder and that they were in the United States with orders to lift the level of violence committed by MS-13 members.  Defendants Cordova and Gutierrez further admitted (i) shooting rival gang members that were in a car in Virginia, (referring to the July 30, 2006, shooting of Dennis Diaz); (ii) shooting a "chavala" (or a rival gang member) in DC, in the head, while the chavala was at an intersection where a traffic light was located because defendant Cordova was beaten earlier in the day by members of the chavala's gang, (referring to the April 22, 2007, murder of Edwin Ventura); and (iii) doing something to a lady in DC but that she did not die (referring to the June 1, 2007, shooting of Feliciana Esquina-Flores).  In making this known about themselves, defendants Cordova and Gutierrez were, as they had previously done while in the Washington DC area, once again enhancing and maintaining their

---

[9]     Although husband and wife, Tomas Perez and Feliciana Esquina-Flores do not share the same the last name.

positions within the MS-13 enterprise, but this time while in the presence of NY MS-13 members. In addition, while in New York, defendant Cordova called a member of the DC MS-13 Sailors and made reference to needing to return to the area for a shooting of an old lady.  In making this statement, defendant Cordova was again referring to Feliciana Esquina-Flores.  The government's evidence will expose that during this time period, both defendants Cordova and Gutierrez had active arrest warrants in Washington DC.

19.     After establishing themselves in New York, defendants Cordova and Gutierrez once again continued to commit murder in furtherance of the MS-13 enterprise.  On July 12, 2007, defendants Cordova and Gutierrez and other members of MS-13 murdered a rival gang member. In this murder, defendant Cordova and another MS-13 member shot and killed the rival gang member while defendant Gutierrez and another MS-13 member aided and abetted.  In this murder, Cordova was armed with .357 caliber handgun while the other MS-13 member was armed with .38 caliber handgun.

20.     Between July 12, and July 18, 2007, Cordova, Gutierrez, and other members of MS-13, including but not limited to, MS-13 member Alejandro Enrique Umana, traveled from New York to Greensboro, NC via a automobile.  In their travels, Cordova and Gutierrez repeatedly asked to stop in DC so they could finish off the lady whom they had done something to but did not die.  When they arrived in NC, Cordova, Gutierrez, and other members of MS-13 obtained a .45 caliber hand gun, a .38 caliber hand gun, and grenades.  In the their travel back to New York, Cordova and Gutierrez again repeatedly asked to stop in DC so they could finish off the woman.

21.     Back in New York, on July 18, 2007, defendants Cordova, Gutierrez, and another MS-13 member murdered another rival gang member.  In this murder, Cordova, armed with the .45

caliber handgun obtained in NC, and Gutierrez, armed with a .38 caliber, shot at rival gang members, and in so doing, murdered a rival gang member as he sat in his a car. After committing this murder, defendant Gutierrez admitted shooting at the driver of the car but that the driver tried to escape by driving away. Defendant Cordova admitted shooting the driver in the head as the driver drove away.

22.     On July 19, 2007, shortly after committing the murder on July 18, defendant Gutierrez was arrested inside a residence located at 4517, 164 Street, Apartment 1F, Queens, New York. Defendant Gutierrez was arrested based on the active arrest warrant in Washington DC.[10]

23.     On August 6, 2007, defendant Cordova was arrested in Greensboro, NC. At the time of his arrest, defendant Cordova was a front seat passenger inside a vehicle that was stopped on Lynwood Street, Greensboro, NC. Officers observed the vehicle driving away from the Best Value Inn and Suites Motel, located at 2600 Preddy Bouleveard, Greensboro, NC. Prior to stopping the vehicle, the officers observed defendant Cordova make furtive movements as if concealing an object. After arresting defendant Cordova for the outstanding arrest in Washington DC, officers found a loaded .38 caliber revolver between the driver's seat and the transmission floor shift lever. The government's evidence will expose that defendant Cordova fled from New York to NC with other MS-13 members following the arrest of defendant Gutierrez. Defendant Cordova traveled to North Carolina via automobile with other MS-13 members, including but not limited to, Alejandro Enrique Umana. In their travel, defendant Cordova and other MS-13 members stopped in Washington DC and picked-up two minor females. Cordova and the other MS-13 members transported the minor females to the Best Value Inn and Suites Motel for the purpose of prostituting them. After defendant

---

[10]     Defendant Gutierrez was arrested in New York based on an outstanding warrant issued by the Superior Court for the District of Columbia for Felony Threats on Feliciana Esquina-Flores.

Cordova was arrested, officers returned to the Best Value Inn and Suites Motel and observed a red SUV vehicle drive up to the motel room where the two minor females were believed to be located. Inside the vehicle, officers observed MS-13 member Alejandro Enrique Umana making furtive movements as if to conceal an object. After Umana exited the vehicle, officers observed a green colored substance, wrapped in plastic, on the floorboard under the edge of the seat. The substance was seized and confirmed to be marijuana. Mr. Umana was searched and on his person officers found six small bags each containing cocaine inside of his wallet. Mr. Umana was arrested and photographed.[11]

24.     On September 10, 2007, defendant Gutierrez arrived in Washington DC and was interviewed at the MPD by Spanish speaking MPD detectives Emilio Martinez and Elba Longo. This interview was video taped. Defendant Gutierrez entered the interview room approximately 28 minutes after the video tape machine began recording. At this point, defendant Gutierrez's handcuffs were released by detective Martinez. When asked by detective Longo if he spoke English, defendant Gutierrez stated "no." After waiting approximately 13 minutes, detective Longo returned to the room and proceeded to read defendant Gutierrez an Advisement of Rights form, also known as a PD-47, written in Spanish. The PD-47 form contained spaces for the defendant to answer and sign. (See Attachment A- Gutierrez Advisement of Rights). The PD-47 form informed the defendant of the following:

   a.    That the defendant was detained and that before beginning, the defendant should understand his rights.
   b.    That the defendant had the right to remain silent. That the defendant was not required to say anything at any moment or answer any question. Anything that the defendant said could be used against him in court.

---

[11]     Mr. Umana has the letters "MS" tattooed on his body.

c.      That the defendant had the right to speak to an attorney to advise him before any questions were asked of the defendant and that the defendant had the right to have his attorney present during the interview.

d.      That if the defendant could not afford an attorney and wanted one, an attorney would be provided for the defendant.

e.      That if the defendant wanted to answer questions without an attorney present he would still have the right to stop answering questions at any moment. And that the defendant had the right to stop answering questions at any moment until you speak to an attorney.

25.    Detective Longo then asked defendant Gutierrez the following questions to which he answered yes:

f.      Have you read, or have they been read to you, the advisement of rights?

g.      Do you understand your rights?

h.      Do you wish to answer questions?

i.      Do you wish to answer questions without an attorney present?

26.    Defendant Gutierrez wrote the word "Si," meaning yes by each of the above questions and then signed his name "Jose G." Detective Longo documented the time of 10:37 p.m. and the date of September 10, 2007, in the spaces provided and signed the PD-47 form. Detective Emilio Martinez signed his name in the witness space provided. Thereafter, defendant Gutierrez was advised that he also had the right to an interpreter during the interview but waived that right upon being asked if he understood detectives Longo and Martinez when the spoke to him in Spanish and whether he wished to proceed without an interpreter. [12] Approximately 50 minutes after having waived his rights, defendant Gutierrez's interview began with detective Longo translating the questions and responses and detectives Jed Worrell, Jacqueline Middleton, and Emilio Martinez posing the questions.

---

[12]    Detectives Elba Longo and Emilio Martinez both speak and read the Spanish language.

27.     Defendant Gutierrez acknowledged being detained at Rikers Island, New York detention facility before arriving to Washington DC.  After providing his full name of Jose Gutierrez Castro, his date of birth of January 7, 1989, and other biographical information, the defendant said that he arrived to the Washington DC area in December (of 2006).  Defendant Gutierrez said he left El Salvador and started living at XXXXX Myrtle Avenue, NW, with persons named "Giovanny," and other persons named "Christian, Naun, Jose Carlos, Rigoberto."   Defendant Gutierrez later clarified that the person known to him as "Giovanny" and "Misael" (Esquina-Flores) were the same person.  Defendant Gutierrez said he was renting a room for $200 a month at this residence and that he was sharing the room with co-defendant "William" Cordova and Giovanny.  Defendant Gutierrez said he had known Giovanny and his brother Naun, and also Rigoberto, from El Salvador. Defendant Gutierrez said he had known co-defendant "William" Cordova for about two years and that they too had known each other in San Salvador, EL Salvador.   Defendant Gutierrez said he thought that co-defendant William Cordova had been in the United States for about 1 year. Defendant Gutierrez said he had been renting a room at the Myrtle Avenue residence from December (2006) to May (2007), and that he moved because of the "problem" there and because he was asked to leave.  Defendant Gutierrez claimed he moved to New York because he could not find work in DC and as such had trouble paying the rent.  Defendant Gutierrez said he worked giving tattoos and was known by the alias  the "Angel."  Defendant Gutierrez disclaimed ever being known as "Astuto."  Defendant Gutierrez further said that co-defendant "William" Cordova was known as "El Flaco," and disclaimed knowing co-defendant Cordova by the alias "Centinela."   Defendant Gutierrez admitted that he was a member of MS-13.

28.     With respect to the "problem" at XXXXX Myrtle Avenue, defendant Gutierrez

acknowledged that he had been interviewed previously by detectives Martinez and Marcucci regarding the incident with the lady of the house, referring to Feliciana Esquina-Flores, but that, as he had stated before, he did not know anything about that incident (see ¶ 17, *supra*). Defendant Gutierrez said he called a friend in New York named Jose Irheta who provided money for defendant Gutierrez to take a bus to Flushing, New York shortly after the incident to Feliciana Esquina-Flores. Defendant Gutierrez said he later learned that co-defendant "William" Cordova had gone to North Carolina and had been arrested. Defendant Gutierrez said that before he left for New York, he had learned from the man of the house, referring to Tomas Perez, and his son, that Feliciana Esquina-Flores had been "hurt by a gun." Defendant Gutierrez disclaimed ever possessing a gun in the United States or co-defendant "William" Cordova ever possessing a gun in the United States.

29.     With respect to the murder of Edwin Ventura, defendant Gutierrez admitted that he had frequented the area of 11th and Lamont Streets, NW, to associate with other members of MS-13. When confronted with co-defendant Cordova having told the detectives that defendant Gutierrez was involved in the murder and that he shot the decedent, defendant Gutierrez disclaimed any participation and said that he had no idea why co-defendant Cordova would say as such. Defendant Gutierrez said he had no information about the murder. Defendant Gutierrez again admitted that he and co-defendant Cordova were members of MS-13 but stood firm by his account disclaiming any information, and much less any participation, in the murder of Edwin Ventura. Defendant Gutierrez acknowledged that "La 18" gang was a rival gang of MS-13 and that he had handled and fired small caliber hand guns while in El Salvador. However, defendant Gutierrez disclaimed ever being involved-in, or hearing about, problems that MS-13 members had with rival gangs in the area. When asked what his co-defendant Cordova would do if he were attacked with a bat, defendant Gutierrez

said it would be logical for co-defendant Cordova to react in-kind or perhaps react in a more customary way- such as kill.   Defendant Gutierrez later went on to say that if members of MS-13 are attacked they attack in-kind, that MS-13 has members across the entire country (United States), and that he had no regrets about being in MS-13 - that "he was good" with it.  Defendant Gutierrez identified a photograph of co-defendant Cordova.  Defendant Gutierrez admitted that other MS-13 members would consider any fellow members who speak to law enforcement to be "rats," and it likely that they would be killed.

      30.     At time stamp 3 hours and 6 minutes, defendant Gutierrez's interview terminated.[13] Throughout his entire interview, defendant Gutierrez was very aware and lucid.  He understood the questions posed and provided articulate responses.   Indeed often times during the interview, defendant Gutierrez corrected the detectives reminding them of the specific questions asked of him and how his answers directly answered their questions. Defendant Gutierrez even informed the detectives of when the questions were "entangled" and needed to be more clearly posed.  At no time during the interview did defendant Gutierrez display cognitive deficiencies or an impaired ability to express his responses.   On the contrary, in the face of repeated efforts by the detectives to out-fox and ruse him, defendant Gutierrez remained astute to the questions posed and steadfast to his versions of the both the events related to the murder of Edwin Ventura and the shooting of Feliciana Esquina-Flores.

---

[13]     The total run time indicated on the video taped interview differs from the actual interview time by approximately one hour and a half.  The total run time begins when the video tape machine was turned on, however, defendant Gutierrez's interview began approximately one hour and a half after the video machine began recording.  Thus, although the total run time stamp of 3 hours and 6 minutes appears as the time the interview was terminated, defendant Gutierrez had only been interviewed for approximately 1 hour and 30 minutes.

31.     Following his arrest, defendant Cordova was transported to the District of Columbia and interviewed by MPD detectives Jed Worrell, Emilio Martinez, and Elba Longo.  The interview was conducted in Spanish and it was video taped.  Before starting, detective Longo provided defendant Cordova with a medical face mask due to him having been ill around that time period. Detective Longo asked defendant Cordova if he understood detectives Longo and Martinez when they spoke to him in Spanish to which he replied yes.  When asked if he desired an interpreter present to assist him in the interview, defendant Cordova replied no and said he wanted to proceed with the detectives Longo, Martinez, and Worrell.  Detective Longo made reference to defendant Cordova's Fifth Amendment right and proceeded to read him an Advisement of Rights form, also known as a PD-47, written in Spanish.  The PD-47 form contained spaces for defendant Cordova to answer and sign.  (See Attachment B- Cordova Advisement of Rights).  The PD-47 form informed the following:

a.     That the defendant was detained and that before beginning, the defendant should understand his rights.

b.     That the defendant had the right to remain silent.  That the defendant was not required to say anything at any moment or answer any question.  Anything that the defendant said could be used against him in court.

c.     That the defendant had the right to speak to an attorney to advise him before any questions were asked of the defendant and that the defendant had the right to have his attorney present during the interview.

d.     That if the defendant could not afford an attorney and wanted one, an attorney would be provided for the defendant.

e.     That if the defendant wanted to answer questions without an attorney present he would still have the right to stop answering questions at any moment.  And that the defendant had the right to stop answering questions at any moment to speak to an attorney.

32.     Detective Longo then summarized the rights once again for defendant Cordova and asked if he understood them.  Defendant Cordova said he understood his rights and he then answered

yes to the following questions:

      f.       Have you read, or have they been read to you, the advisement of rights?
      g.      Do you understand your rights?
      h.      Do you wish to answer questions?
      i.       Do you wish to answer questions without an attorney present?

33.      Defendant Cordova wrote the word "Si," meaning yes by each of the above questions and then signed his name "William A.C."  Detective Longo documented the time of 10:01 a.m. and the date of September 13, 2007, in the spaces provided and signed the PD-47 form.  Detective Emilio Martinez signed his name in the witness space provided.  Thereafter, the defendant was interviewed with detective Longo translating the questions and responses.

34.      Defendant Cordova stated that he entered the United States illegally via Houston, Texas and then traveled to Washington DC where he resided with the Esquina-Flores family.  The defendant stated he lived with the Esquina-Flores family first at their XXXXX Morton Street residence and then also at their Myrtle Street residence as well.  Defendant Cordova stated the names of the other persons that resided with the Esquina-Flores family and that he and co-defendant Jose Gutierrez shared a bedroom with one of the Esquina-Flores' sons (referring to Misael Giovanny Esquina-Flores).  Defendant Cordova claimed that he traveled to the United States from El Salvador for work so that he could help his poor family and his baby.  Defendant Cordova said that while he was in Houston, Texas, he had trouble with the "coyotes," meaning the persons that smuggle persons into the United States illegally.  Defendant Cordova acknowledged knowing most of the sons and nephews of Mr. Tomas Perez and his wife Feliciana Esquina-Flores and admitted contacting them before traveling to Washington DC, to ask whether he could reside with them.  Defendant Cordova said he left the DC area when he learned that Feliciana Esquina-Flores had an accident and that he

was accused of being involved.  Defendant Cordova said he left the area and stayed with a female friend for a couple of days and then traveled to Greensboro, North Carolina where he remained until he was arrested.[14]  While in North Carolina, defendant Cordova claimed that he lived in a hotel and found work locally.  Defendant Cordova said he had a friend in North Carolina that was from the same gang and he acknowledged that being a member of the (MS-13) gang had helped him travel to-and-from various locations.  Defendant Cordova said that while he was in North Carolina, he had been in fear of losing his life because once "you join (a gang) there are enemies in the streets and death can be in the streets."  Defendant Cordova said that the day he was arrested in North Carolina, he was traveling with his friend named"Abraham," in Abraham's car, on their way to buy food.  Defendant Cordova said there was a gun in the car but that the gun belonged to Abraham.  Defendant Cordova denied making any movements as if to conceal the gun before the Greensboro police officers stopped the car they were in.  Defendant Cordova said the gun in the car was a .38 caliber and that he knew this because of his experience in the gang.  Defendant Cordova admitted touching the gun a couple of hours before being arrested but disclaimed knowing whether his fingerprints would be found on the gun.  When shown photographs of persons he was with while in North Carolina, defendant Cordova identified them and qualified who were members versus retired members of the MS-13 gang, and, those who were non-members.  Defendant Cordova admitted being a member of MS-13 and displayed the various tattoos on his body, including the large letters "MS" on his chest and the large letters across his abdomen "SCLS," which the defendant claimed stood for "Salvadorenos Coronados Locos Salvatrucha," an MS-13 clique in El Salvador.  Defendant

---

[14]     The defendant was arrested in Greensboro, North Carolina based on an outstanding warrant issued by the Superior Court for the District of Columbia for Felony Threats on Feliciana Esquina-Flores.

Cordova admitted joining MS-13 in El Salvador but claimed that this was a reason why he left El Salvador- to get away from the gang.  Defendant Cordova claimed that co-defendant Jose (Gutierrez) was not a member of MS-13 but admitted that Jose (Gutierrez) had given the defendant one of the tattoos on his chest.  Defendant Cordova claimed that his alias was "the devil" and disclaimed ever being known as "Centinela," despite having the word "Centi" tattooed on his forearm.  Defendant Cordova claimed that the person known as Centinela was a very good friend of his but that Centinela had been killed in El Salvador.

35.     With respect to the trouble he had with the Esquina-Flores family, defendant Cordova said that Mr. Tomas Perez and his wife Feliciana Esquina-Flores[15] did not want their son, Giovanny, referring to Misael Giovanny Esquina-Flores,[16] associating with defendant Cordova because of his gang membership and that this was one of the reasons for their trouble.  Defendant Cordova admitted having discussed these troubles with the Esquina-Flores family and that during their discussions he was asked to leave the residence.  Defendant Cordova said that the Esquina-Flores family were upset at him for not falling behind in the rent payments.  Defendant Cordova said he had known Misael Esquina-Flores in El Salvador and that while residing with the Esquina-Flores family in the United States, defendant Cordova had suggested various ways for the family to maintain control of their son. When asked whether he was aware that Mr. Tomas Perez told Misael Esquina-Flores to stay away from him because of his membership in MS-13, defendant Cordova responded that he told Misael Esquina-Flores that the decision to join MS-13 or remain with his family was up to Misael Esquina-

---

[15]     As mentioned *supra*, although husband and wife, Tomas Perez and Feliciana Esquina-Flores do not share the same the last name.

[16]     As with co-defendant Gutierrez, during the interview, defendant Cordova referred to Misael Giovanny Esquina-Flores by his middle name: "Giovanny."

Flores alone.    Defendant Cordova disclaimed being an active member of MS-13 and that with respect to gang membership he did not force Misael Esquina-Flores to make a decision either way. Defendant Cordova admitted that he had been asked to leave the Esquina-Flores residence on two occasions but said that while he lived there, he purchased his own food and paid rent when he could. He admitted falling behind in the rent payments because of his illness but said that Mr. Perez allowed him to stay further without making payments.

36.    With respect to his whereabouts on the day Feliciana-Esquina Flores was shot, defendant Cordova acknowledged that, during that time, he was living with the Esquina-Flores family at their Myrtle Street residence and that he woke-up around 9:00 a.m. that morning. Defendant Cordova said that Jose (Gutierrez) was in the house that morning but that Misael Esquina-Flores had left early that morning to find work.   Defendant Cordova said he answered the telephone that morning and spoke to a Mexican male was asked to speak to Tomas Perez and his wife,  to which the defendant said that they were at work.   Later that morning, defendant Cordova  answered the telephone again and spoke to a male that was the owner of the building where the Esquina-Flores family had previously lived on Morton Street.   Defendant Cordova said he watched television and left the Myrtle Street residence around 12:00 p.m. to obtain his check.   Defendant Cordova initially said that co-defendant Jose (Gutierrez) remained at the residence with one of Mr. Perez's nephews. Defendant Cordova said that he obtained a ride from Misael Esquina-Flores and his friend named "Melvin," also known "Enano."   Defendant Cordova said that Melvin's car was a four-door, grey Toyota Tercel, with DC tags and that he left the residence with Melvin while Misael Esquina-Flores and co-defendant Jose Gutierrez remained at the residence.   Defendant Cordova said that Melvin drove to a Metro Station and dropped him off.   Defendant Cordova claimed that he then traveled by

Metro to a Five Guys restaurant to pick-up his check, then cashed it, and returned to work.  While at work that afternoon, defendant Cordova said that he learned from the manager around 4:00 p.m. that Feliciana Esquina -Flores had been shot.  Defendant Cordova said that later that afternoon, around 5:00 to 5:30 p.m., Misael Esquina-Flores visited him.  Defendant Cordova said he was aware that he was being accused of shooting Feliciana Esquina-Flores but disclaimed knowing any information about the shooting, much less being actually involved.  Defendant Cordova acknowledged that it appeared bad for him to leave Washington DC after Feliciana Esquina-Flores was shot but said that he did so because he was scared.  Defendant Cordova also acknowledged being in trouble in his country of origin (El Salvador) and that he did not want similar trouble in the United States.  After confronted with being identified as the shooter of Feliciana Esquina-Flores, and his friends, including co-defendant Jose (Gutierrez) and Misael Esquina-Flores, blaming him for the shooting, defendant Cordova maintained that he had no involvement in the shooting.

37.    Defendant Cordova admitted associating with the MS-13 gang members that frequented the area of 11th and Lamont Streets, NW, Washington DC, but claimed that it was only in passing, when he was en route elsewhere.  Defendant Cordova named the persons that regularly frequented 11th and Lamont Streets and admitted that, on a previous occasion, he and a friend named "Leonel" had been assaulted by other men who were armed with objects.  In the assault, "Leonel" sustained injuries but defendant Cordova did not.  Defendant Cordova disclaimed ever carrying a gun in Washington DC.  When asked if he had committed murder in El Salvador, defendant Cordova said it was logical that being a gang member in El Salvador would require one to defend himself and then qualified his response by adding that although he had been accused of it (murder in El Salvador) and had spent 3 months in jail, he had been released only to be later re-arrested.  Defendant Cordova

later clearly acknowledged being accused of committing two murders in El Salvador. A murder committed with a knife and the another committed with a gun. And despite previously telling the detectives he had not possessed a hand gun in EL Salvador, defendant Cordova later admitted that he had possessed a .9 millimeter hand gun in El Salvador.

38.     With respect to the murder of Edwin Ventura, defendant Cordova claimed he had heard on the news about an individual being murdered on Sherman Avenue, NW, Washington. He admitted being in the area of 11th and Lamont in the afternoon the day before the murder occurred but claimed to have left the area around 5:00 pm that afternoon. Defendant Cordova said that he returned to 11th Street the following day and saw police officers present. Although he initially disclaimed knowing the relationship between the gangs LC and MOB and whether they were rivals of MS-13, defendant Cordova said he learned of a shooting on 11th Street two days after the murder, that shooters had been arrested but that it was common, even on a daily basis, for members of MS-13 that frequented 11th Street to get into assaults with other rival gangs, particularly the one from 14th Street and another gang from further down the street that was aligned with the 14th Street gang. Defendant Cordova later added that he learned from local MS-13 members that the 14th Street gang was associated with LC and that there was another local gang known as STC (referring to Street Thug Criminals). When confronted with committing the murder of Edwin Ventura with co-defendant Jose Gutierrez, defendant Cordova disclaimed any involvement. With respect to the manner in which he left 11th Street the evening of the murder, defendant Cordova admitted being given a ride by a guy with long hair that was present on 11th Street but that the time was 5:00 p.m.

to 5:30 pm.[17]  Defendant Cordova later changed this by saying that he was unsure of the time and

that they left when it became dusk.  And although he initially said they rode in a white car, defendant

Cordova later acknowledged that they rode in white truck (SUV).  Defendant Cordova admitted that

he, co-defendant Jose (Gutierrez), co-defendant Melvin (Sorto), and the driver of the truck (the one

with long hair) left the area of 11th Street together but that he and co-defendant Jose (Gutierrez) were

dropped-off at their home while the driver and Melvin drove away thereafter.

      39.    After 5 hours and 37 minutes, the defendant asked to speak to his lawyer.[18]

Throughout the entire interview, defendant Gutierrez remained calm, was lucid, and displayed a

complete and thorough understanding of the topics being discussed.  At no time during the interview,

was the defendant threatened or forced to make any statements. And at no time during the interview

did defendant Cordova display cognitive deficiencies or an impaired ability to express his responses.

On the contrary, in the face of repeated efforts by the detectives to out-fox and ruse him, defendant

Cordova, like co-defendant Gutierrez, remained astute to the questions posed and steadfast to his

versions of the both the events related to the murder of Edwin Ventura and the shooting of Feliciana

Esquina-Flores.

      40.    While detained at the District of Columbia Jail (DC Jail), defendant Cordova

---

[17]    Government witnesses will expose that co-defendant William Osorio-Rivas had long hair during the time of the murder of Edwin Ventura and shortly thereafter cut his hair very short.

[18]    The total run time indicated on the video taped interview differs from the actual interview time by approximately one hour.  The total run time begins when defendant Cordova was first placed in the interview room.  However, the defendant sat in the interview room for approximately one hour before the interview started.  Thus, although defendant Cordova invoked his rights at time stamp 5 hours an 37 minutes, the point at which the interview terminated, he had only been interviewed for approximately 4 hours and 37 minutes.

maintained contact with other members of MS-13, both in the United States and in El Salvador, and

conspired with them to kill persons considered threats to the MS-13 enterprise.  On June 5, 2008,

while detained at the DC Jail, defendant Cordova spoke on the telephone to El Salvador MS-13

member "Spyder."  The telephone call was recorded.  Defendant Cordova spoke to Spyder about

defendant Cordova and other MS-13 members in DC waiting additional time before assaulting a

local woman who could incriminate MS-13 members in El Salvador.  On June 7, 2008, while

detained at the DC Jail, defendant Cordova spoke on the telephone to Maryland MS-13 member

"Cuervo."  The telephone call was recorded.  Defendant Cordova and Cuervo discussed plans to

tamper, threaten, and interfere with the testimony of MS-13 members suspected of cooperating with

the government against defendant Cordova.

41.     In addition, while detained at the DC Jail in the 2008, defendants Cordova and

Gutierrez, continued to assault and threaten, this time fellow inmates, in furtherance of the MS-13

enterprise.  In 2008, defendants Cordova and Gutierrez threatened to kill inmates if they did not pay

dues or give-up their food to Cordova and Gutierrez.  On one occasion, a victim-inmate was

confronted inside his cell by inmate members of MS-13.  Defendant Gutierrez stood guard by the

inmate-victim's cell door.  Two MS-13 inmate members, one armed with a shank, entered the cell

and assaulted the inmate-victim.  Defendant Cordova ordered the assault.  On a second occasion, DC

Jail officers found a shank inside a cell occupied by two inmate MS-13 members.  Defendant

Cordova and another inmate accused a victim-inmate of telling the officers about the shanks.

Defendant Cordova, armed with a shank, assaulted the victim-inmate and attempted to pull him into

a cell to better assault and stab him.[19]

42. After Cordova's and Gutierrez's arrest, defendant Sorto continued to be leader of the MS-13 Sailors. In so doing, defendant Sorto participated in additional crimes in furtherance of the MS-13 enterprise. On October 27, 2007, defendant Sorto and other members of MS-13 participated in the stabbing of rival gang member Pablo Rene Castillo-Chavez. Mr. Castillo-Chavez was assaulted because he was a member of the rival gang "La 18." The assault occurred outside the El Salvadoreno Restaurant located on 14th Street, NW, Washington DC. Prior to the assault, Mr. Castillo-Chavez was inside the restaurant where he was noticed by MS-13 members. The MS-13 members noticed a tattoo on Castillo-Chavez's neck depicting the numbers "18" in Roman numerals. The MS-13 members conspired to attack Castillo-Chavez and called defendant Sorto and requested he come to the restaurant to assist and bear witness. When defendant Sorto arrived, the MS-13 Sailors conspired further to assault Castillo-Chavez. After Castillo-Chavez walked out of the restaurant, he was surrounded by several MS-13 members, assaulted, and stabbed 5 times.

43. On October 28, 2007, defendant Sorto participated in the stabbing of Celso Curiel in the 1400 block of Ogden Street, NW, Washington DC. In this assault, Curiel was walking home when he noticed MS-13 members sitting in front of a red brick building. Curiel walked by the men but quickly noticed that the MS-13 members started to follow him. One of them was talking on a cell phone. Curiel was apprehended, repeatedly beaten, and then stabbed in the back. The MS-13 members made good their escape. The following day, defendant Sorto admitted and bragged about participating in this stabbing to government witnesses.

---

[19] With respect to the two DC Jail incidents, the names of the victim-inmates are not listed due to the serious witness security risks that would result in publishing this information at this time.

44.     On June 11, 2008, defendant Sorto was arrested by agents from the Immigration, Customs and Enforcement (ICE).  Defendant Sorto was arrested pursuant to a warrant issued when the Grand Jury for the District of Columbia returned the indictment in the instant case.[20]  At the time of his arrest, defendant Sorto was working at a construction site located off Toledo Terrace in Hyattsville, Maryland.  Following his arrest, defendant Sorto was transported to an ICE office located in Merrifield, Virginia where he was interviewed.  Defendant Sorto speaks both English and Spanish and as such his interview was conducted in both languages.  ICE Special Agents Jason Shatarsky and Robert Nieves conducted the interview of defendant Sorto.  Agent Nieves speaks and reads Spanish.  And although agent Shatarsky's first language is English, he has some limited ability to speak and understand Spanish as well.  The interview was not video taped.  Before beginning the interview, defendant Sorto was read an Advisement of Rights Form written in Spanish.  The form contained spaces for defendant Sorto to sign.  (See Attachment C- Sorto Advisement of Rights).  The form informed defendant Sorto of the following:

a.     That before beginning with any question, the defendant should understand his rights.
b.     That the defendant had the right to remain silent.
c.     That anything the defendant said could be used against him in court or in any other proceeding.
d.     That the defendant had the right to consult with an attorney before making any statement or answering any questions.
e.     That the defendant had the right to an attorney being present during the interview.
f.     That if the defendant could not afford an attorney, one would be provided for him before any questions were asked, if the defendant so desired.
g.     That if the defendant wanted to answer questions now, the defendant would retain the right to stop the interview at any moment, or the stop the interview in order to consult with and attorney.

---

[20]     The Indictment in the instant case was returned on June 10, 2008.

45.     Defendant Sorto then signed his name "Melvin Alexander Sorto," in the space provided.  Agents Nieves and Shatarsky signed their names in the witness spaces provided.  The final section of the advisement of rights form stated the following:

> They have read or explained to me this advisement of my rights and I understand completely these rights.  I waive them freely and voluntarily, without being threatened or intimidated, and without promises of compensation or immunity.  I was detained at 10:00 [a.m.], on June 11, 2008, and I have signed this document at 11:41 [a.m.] on June 11, 2008.

46.     Thereafter, defendant Sorto was interviewed.  Defendant Sorto stated he was "jumped-in" to the MS-13 Sailors Clique in 2006, and that in 2006 and 2007, the MS-13 Sailors were "jumping in people like crazy."  Defendant Sorto admitted attending MS-13 Sailors meetings and acknowledged that one of his aliases is "Fantasma."  Defendant Sorto stated that the MS-13 Sailors frequented the area of 16th Street, NW, and also 11th and Lamont Streets, NW.  Defendant Sorto admitted that he attended MS-13 meetings but claimed that each meeting was run by a different member and that the MS-13 Sailors never revealed the identity of their clique leader. Defendant Sorto disclaimed knowing the rules of MS-13 or associating with MS-13 members from Maryland and Virginia.  Defendant Sorto said he knew the following members of the MS-13 Sailors clique: "Skylar, Lonely, Liar, Scrappy, Blazer, Majestic, Unico, and Ice-Kill."

47.     With respect to co-defendants Cordova and Gutierrez, defendant Sorto admitted knowing defendant Cordova as "Centinela," and defendant Gutierrez as "Astuto."  Defendant Sorto said that the he met both co-defendants Cordova and Gutierrez at a party in 2007.  Defendant Sorto identified the photographs of co-defendants Cordova and Gutierrez.  In addition, defendant Sorto admitted that the United States Postal Service money order receipts found on his person were indeed receipts for money that he had mailed to co-defendants Cordova and Gutierrez on January 29, 2008,

while the two were detained at the District of Columbia Jail.  Defendant Sorto also admitted that one

of the receipts was for MS-13 member "Liar" who was also detained at the DC Jail at that time.[21]

According to defendant Sorto, MS-13 member "Blazer" gave defendant Sorto money to purchase

the money orders and place them into the DC Jail accounts of co-defendants Cordova and Gutierrez

and their fellow MS-13 member Liar.  Each money order was for the sum of $35.00

48.     With respect to the murder of Edwin Ventura, defendant Sorto disclaimed knowing

any direct information about the murder much less having participated in the crime.  He claimed that

he never left his residence the night of the murder.  However, defendant Sorto did state that on the

night of the murder, he received a call from an MS-13 associate known as "Roberto" who told

defendant Sorto that there had been an incident and that everyone needed to respond to 11th and

Lamont Streets NW.  Defendant Sorto stated he never responded that night but learned of the murder

the following day when he read the Spanish newspaper "El Tiempo."  According to defendant Sorto,

the El Tiempo newspaper reported that two African Americans committed a murder at 11th and

Lamont Streets, NW, and that two persons were seen running from the scene.

49.     Following a consent to search his cellular telephone, defendant Sorto went on to

identify numerous friends and members of MS-13 and their contact information which defendant

Sorto had saved in his cellular telephone.  Throughout the entire interview, defendant Sorto remained

calm, was lucid, and displayed a complete and thorough understanding of the topics being discussed.

At no time during the interview was defendant Sorto threatened or forced to make any statements.

And at no time during the interview did defendant Sorto display cognitive deficiencies or an

---

[21]     ICE Agents have confirmed that MS-13 member Liar's true name is German
Bonilla.

impaired ability to express his responses.   On the contrary, like co-defendants Cordova and Gutierrez, defendant Sorto remained astute to the questions posed and steadfast to his versions of the events related to the murder of Edwin Ventura.

50.     In January 2008, defendant Osorio-Rivas was arrested by agents from Immigration Customs and Enforcement (ICE) for being an illegal immigrant.   When he noticed law enforcement that day, Osorio-Rivas fled on foot and was chased by officers .   When arrested, defendant Osorio-Rivas was in possession of a hand written MS-13 letter proclaiming, *inter alia*, that MS-13 "Sailors are controlling the 'District of Crime,'" and that "we're Big Time Mara Salvatrucha.  You should have never fucked with us, you paid the consequences and now your in the grave."   Defendant Osorio-Rivas admitted to ICE Agents that he wrote the letter.

51.     Thereafter, defendant Sorto continued to employ threats and violence in furtherance of the MS-13 enterprise.   In January or February of 2008, in Washington DC, defendant Sorto entered the apartment of a woman and confronted her disobedience and loyalty to MS-13.   Defendant Sorto demanded that the female make arrangements to prostitute herself and others for the benefit of MS-13.   When the female refused, defendant Sorto placed the barrel of his hand gun to her head and threatened to kill her if she did not comply.   Defendant Sorto withdrew his handgun upon seeing another gang member intervene.[22]

III.     **Responses and Authorities.**

   A.     **Motions to Suppress Statements**

52.     Defendants Cordova, Gutierrez, and Sorto move this court to suppress their

---

[22]     As is the case with the other victims and witnesses noted *supra*, serious witness security issues would result in releasing the name of this victim at this time.

statements.  See Defendant Cordova Motion at Document Number 41, Defendant Gutierrez Motion

at Document Number 46, and Defendant Sorto Motion at Document Number 60.  Where, as here,

the defendants' statements are made afer a knowing and intelligent waiver, their motions to suppress

are without merit and should be denied.

53.     Here, defendant Cordova, Gutierrez, and Sorto where each provided with a clear

advisement of their rights.  See ¶¶ 24-26, 31-33, and 44-45, *supra*.  The rights form were even

provided to each defendant in their native Spanish languages by Spanish speaking detectives and

agents.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that, in order to "dispel

the compulsion inherent in custodial" interrogation, certain warnings must be given "at the outset

of the interrogation."  Id., 384 U.S. at 457-458.  Those warnings advise the suspect that he has the

right to remain silent, that any statements he makes can be used against him in court, that he has the

right to consult with counsel, and that if he cannot afford an attorney, one will be provided for him

prior to questioning.  Id., 384 U.S. at 479.  A suspect who receives these warnings may then choose

to waive or invoke his rights.  If the suspect invokes his right to refuse to answer questions or his

right to counsel during questioning, the police must cease questioning him until counsel has been

made available to him, unless he initiates further contact with the police.  Edwards v. Arizona, 451

U.S. 477, 484-485 (1981).  Moreover, as long as the warnings are properly translated, persons who

do not speak English can waive Miranda rights.  Perri v. Director, Dept. of Corrections, 817 F.2d 448

(7th Cir. 1987) (Italian); United States v. Short, 790 F.2d 464 (6th Cir. 1986) (West German); United

States v. Todisco, 667 F.2d 255 (2nd Cir. 1981); Fuentes v. Moran, 572 F. Supp. 1461 (D.R.I. 1983),

aff'd, 733 F.2d 176 (1st Cir.).

54.     The Miranda rights need not be presented to a defendant word for word.  Substance,

not form, is the test.  Florida v. Powell, 2010 WL 605603 (U.S., Feb. 23, 2010); Duckworth v.

Eagan, 492 U.S. 195 (1989); California v. Prysock, 453 U.S. 355, 359-60 (1981); Cummings v. Polk,

475 F.3d 230 (4th Cir. 2007) (officer crosses out "at no cost" on Miranda card); United States v.

Street, 472 F.3d 1298 (11th Cir. 2006) (suspect a police officer).  While Fourth Amendment waivers

need only be voluntary, Schneckloth v. Bustamonte, 412 U.S. 218 (1973), a Miranda waiver must

be both intelligent and voluntary.  Miranda, 384 U.S. at 471-72 (1966).  The "intelligence" element

of a Miranda waiver is traditionally shown by the defendant's affirmative response to the question,

"Do you understand these rights?"  There are even reported decisions upholding waivers where this

key question has not even been asked and answered. United States v. Rubio, 709 F.2d 146 (2nd Cir.

1983); United States v. Hayes, 385 F.2d 375 (4th Cir. 1967). However, the absence of this question

makes proving a waiver very difficult.

  55. The defendant need not know all possible subjects of the conversation before he or

she can make an intelligent waiver.  Colorado v. Spring, 479 U.S. 564 (1987) (arrested for firearms

offense, questioned about a murder); United States v. Valdez, 16 F.3d 1324 (2nd Cir. 1994) (not

advised of existence of arrest warrant); United States v. Syslo, 303 F.3d 860 (8th Cir. 2002). In

circumstances where a third party has retained counsel for a criminal suspect, and the police know

about it but don't tell the suspect, the waiver may still be effective.  Moran v. Burbine, 475 U.S. 412

(1986); United States v. Garlewicz, 493 F.3d 933 (8th Cir. 2007) (defendant unaware court had

appointed counsel on related state charge; this has "no bearing" on the waiver issue); First Defense

Legal Aid v. City of Chicago, 319 F.3d 967 (7th Cir. 2003).  See also Connecticut v. Barrett, 479

U.S. 523 (1987) (intelligent waiver even though defendant made an illogical decision about wanting

to make an oral, not a written statement)

56.     In Davis v. United States, 512 U.S. 452 (1994), the Court addressed what a suspect must do to invoke the right to counsel. There, the police provided the suspect with Miranda warnings, he initially waived his rights to silence and to counsel, and one and one-half hours later, he said, "Maybe I should talk to a lawyer." Davis, 512 U.S. at 454-455.  The Davis Court concluded that the statement was insufficient to invoke the right to counsel.  Id., 512 U.S. at 458, 462.  The Court held that, in order to invoke his right to counsel, a suspect must "unambiguously" request counsel--that is, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459.  If a suspect makes a statement "that is ambiguous or equivocal," the police are not required to cease questioning him.  Id.  Nor are the police required to ask questions to clarify an ambiguous reference to counsel, although it will often be "good police practice" to do so.  Davis, 512 U.S. at 461-462.

57.     An "objective inquiry" is required, the Court explained, to "avoid difficulties of proof and to provide guidance to officers conducting investigations." Davis, 512 U.S. at 458-459.  And, the Court determined, an unambiguous invocation standard best balances the Fifth Amendment interest in protecting against official compulsion and society's interest in uncovering and prosecuting criminal activity.  Id., 512 U.S. at 459-460.  A rule that would require police officers to cease questioning a suspect when they "do not know whether or not the suspect wants a lawyer . . . would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity." Davis, 512 U.S.  at 460 (quoting Michigan v. Mosley, 423 U.S. 96, 102 (1975)).

58.     Before the Miranda decision in 1966, confessions were measured by an evolving voluntariness test founded on common law evidence rules and the due process clause of the

Fourteenth Amendment.  Traditional voluntariness principles are used to test the voluntariness of

Miranda waivers.  A statement is involuntary in violation of due process if a defendant's will was

overborne in the totality of the circumstance.  United States v. Dickerson, 530 U.S. 433,434 (2000);

Rogers v. Richmond, 365 U.S. 534, 544 (1961); Arizona v. Fulminante, 499 U.S. 279, 285-89

(1991).  "If his will has been overborne and his capacity for self-determination critically impaired,

the use of his confession offends due process."  Culombe v. Connecticut, 367 U.S. 568, 602 (1961).

59.     The voluntariness of a Miranda waiver is analyzed using the same guidelines as those

used in determining the voluntariness of statements.  See North Carolina v. Butler, 441 U.S. 369

(1979); Colorado v. Connelly, 479 U.S. 157 (1986).  Title 18 United States Code, § 3501(b)

provides:

> (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including:
>
>> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,
>> (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,
>> (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,
>> (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and
>> (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

60.     The presence or absence of any of the above-mentioned factors to be taken into

consideration by a judge need not be conclusive on the issue of voluntariness of the confession.  See

also United States v. Andaverde, 64 F.3d 1305 (9th Cir. 1995).  The focus is on whether the

confession was obtained in a manner "so offensive to a civilized system of justice that they must be

condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985).  Consequently, police coercion is a "necessary predicate" to a finding of involuntariness.  Colorado v. Connelly, 479 U.S. 157 (1986) (insane person can make voluntary confession, since police did not know he was insane); United States v. Van Metre, 150 F.3d 339, 348 (4th Cir. 1998); Carter v. Johnson, 131 F.3d 452 (5th Cir. 1997); Henderson v. Norris, 118 F.3d 1283, 1288 (8th Cir. 1997).

61.     The key voluntariness concept is the principle that courts must look to the "totality of the circumstances" in determining voluntariness.  Frazier v. Cupp, 394 U.S. 731, 739 (1969); Arizona v. Fulminate, *supra*.  All the details of the interrogation and character of the accused must be assessed.  18 U.S.C. § 3501(b);  Ledbetter v. Edwards, 35 F.3d 1062 (6th Cir. 1994). The test is whether the waiver was voluntary in the totality of the circumstances, and waivers can be voluntary despite the presence of negative factors.  Consequently, there are many reported decisions upholding the constitutionality of confessions despite one or more negative factors.  For instance, with respect to physical impairments.  See, e.g., United States v. New, 491 F.3d 369, 374 (8th Cir. 2007) ("influence of medications, the 'psychological implications' of his circumstances, and his physical helplessness in a strange location"); United States v. Martinez-Perez, 625 F.2d 541 (5th Cir. 1980) (gunshot wounds); United States v. Annis, 446 F.3d 852 (8th Cir. 2006) (drug intoxication); Abela v. Martin, 380 F.3d 915 (6th Cir. 2004) (intoxication, broken nose, pain medication);  Holland v. McGinnis, 963 F.2d 1044 (7th Cir. 1992) (beating); United States v. Gaddy, 532 F.3d 783 (8th Cir. 2008) (intoxication and fatigue are relevant factors, but did not make waiver involuntary); United States v. Burson, 531 F.3d 1254 (waiver valid despite defendant's claim that it was involuntary because he was exhausted and high on methamphetamine); United States v. Shan Wei Yu, 484 F.3d 979 (8th Cir. 2007) (defendant argues he was on prescription medicine and should have received

rights in Chinese); United States v. Phillips, 506 F.3d 685 (8th Cir. 2007) (four ecstasy pills and a

cup of brandy); United States v. Annis, 446 F.3d 852, 856 (8th Cir. 2006) (drug intoxication); United

States v. Harper, 466 F.3d 634 (defendant unconscious following automobile accident); United

States v. Longman, 533 F.Supp. 176 (W.D.Mich. 1982) (alcohol intoxication); Courts have held

similarly with respect to police coercion.  United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998)

(false assurance concerning exposure to prosecution); United States v. Larry, 126 F.3d 1077 (8th Cir.

1997) (false assurance about release from jail); United States v. Crawford, 372 F.3d 1048 (9th Cir.

2004) (pretext search); Pyles v. United States, 124 U.S. App. D.C. 129, 362 F.2d 959 (1966)

(gunpoint); United States v. Syslo, 303 F.3d 860 (8th Cir. 2002) (defendant misled about the subject

matter of the interrogation, and told that Miranda rights were just a "formality"; this was not

"trickery" that would make a Miranda waiver involuntary); Soffar v. Cockrell, 300 F.3d 588 (5th Cir.

2002) (misleading statements about the availability of court appointed counsel did not invalidate an

earlier valid waiver of Miranda rights); but compare., Jackson v. Litscher, 194 F.Supp.2d 849 (E.D.

Wis. 2002) (false statements by police about the availability of counsel will per se invalidate a

waiver).  Coercion that occurs during the interrogation, but after the waiver, does not bear on the

voluntariness of the waiver. United States v. Yunis, 859 F.2d 953 (App. D.C. 1988).

      62.     Courts have upheld voluntary and intelligent waivers even where, as here, a

defendant claims that his mental deficiency rendered him incapable of giving a voluntary and

intelligent waiver.  United States v. Macklin, 900 F.2d 948 (6th Cir. 1990) (mild retardation);

Derrick v. Peterson, 911 F.2d 1366 (9th Cir. 1990) (juvenile, low IQ); United States v. Lamy, 521

F.3d 1257 (10th Cir. 2008) (defendant read at a second-grade level, ranked in the lowest percentile

of his age group in reading comprehension, and was "functionally illiterate"); United States v. Yunis,

859 F.2d 953 (App. D.C. 1988) (intensive questioning, seasickness, broken wrists, unfamiliarity with legal system); Fryer v. State, 325 N.W.2d 400 (Iowa 1982) (mentally challenged defendant).

63.     In the instant case, defendants Cordova, Gutierrez, and Sorto claim that their post-arrest statements were given in violation of Miranda.   That is, that their statements were not voluntarily and knowingly given.   The facts of this case overwhelmingly show the opposite.   All three men were provided with written advisement of rights forms.   The forms were read to them in their native language.   The defendants were asked if they understood their rights and all replied in the affirmative.   They all signed the form waiving their rights and agreed to speak without promises afforded or threats by law enforcement.   The interviews of the defendants were all times held in the presence of Spanish speaking detectives and agents.   The interaction of the defendants demonstrated a keen awareness on their part of the seriousness of the subject matters.   See ¶¶ 27-29, 34-38, and 46-49, *supra*.   They all displayed an astute awareness of the questions posed and expressed their answers articulately and without impairment.   All defendants displayed a beyond average functional literacy and comprehension level that fell far short of rendering them incapable of knowingly waiving their Miranda rights or incapable of engaging in an articulate dialogue with law enforcement.   Based on these facts, defendants Cordova, Gutierrez, and Sorto's motions to suppress statements should be denied.   Further, on these facts there is no need for an evidentiary hearing.

### B.     Motions for Severance

64.     Defendants Sorto and Osorio-Rivas move this Court to Sever their cases from defendants Cordova and Gutierrez.   See Defendant Sorto Motion at Document Number 54 and Defendant Osorio-Rivas Motion at Document Numbers 63 and 65.   The defendants motions to sever are without merit and should therefore be denied.

65.     Federal Rule of Criminal Procedure 8(b),[23] controls joinder of both offenses and

defendants.  See United States v. Wilson, 26 F.3d 142, 153 n.4 (D.C. Cir. 1994), cert. denied, 514

U.S. 1051 (1995).  Charges against defendants are properly joined under Federal Rule 8(b)  when

they are based on a "series of acts or transactions" that are part of a common scheme or plan.  United

States v. Brown, 823 F.2d 591, 598 (D.C. Cir. 1987) (quoting United States v. Perry, 731 F.2d 985,

990 (D.C. Cir.1984)).  The general rule is that defendants who are jointly indicted should be tried

together, and this rule applies with particular force to conspiracy cases.  United States v. Walker, 720

F.2d 1527, 1533 (11th Cir.1983), cert. denied, 465 U.S. 1108 (1984).  This Circuit construes Rule

8 broadly in favor of joinder.  United States v. Richardson, 167 F.3d 621, 624 (D.C. Cir. 1999)

("Joint trials are favored in RICO cases. . . `The joinder presumption is especially strong where . .

. the respective charges require presentation of much the same evidence, testimony of the same

witnesses, and involve . . . defendants who are charged, inter alia, with participating in the same

illegal acts.'") (quoting United States v. Ford, 870 F.2d 729, 731 (D.C. Cir. 1989), cert. denied, 528

U.S. 895 (1999)); United States v. Edelin, 118 F. Supp.2d 36, 40 (D. D.C. 2000) ("[j]oinder of

conspiracy charges and defendants is preferred in this Circuit and in other Circuits.");  United States

v. Gibbs, 904 F.2d 52, 56 (D.C. Cir. 1990) ("[T]his court . . . has repeatedly declared that joint trials

may be preferred, given the heavy and increasing criminal caseload  in our trial courts");  United

States v. Perry, 731 F.2d at 991; United States v. Jackson, 562 F.2d 789, 796-97 (D.C. Cir. 1977);

---

[23]     Pursuant to Federal Rule 8(b), joinder of defendants is permitted when "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.  Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."  Id.

United States v. Hines, 455 F.2d 1317, 1334 (D.C. Cir. 1971), cert. denied, 406 U.S. 975 (1972).

In short, "a substantial public interest supports joint trial."  United States v. Friedman, 445 F.2d

1076, 1082 (9th Cir.), cert. denied, 404 U.S. 958 (1971).   As this Circuit stated in United States v.

Robinson, 432 F.2d 1348, 1351 (D.C. Cir. 1976):

> [Joinder] expedites the administration of justice, reduces the congestion of trial
> dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice
> both time and money to serve upon juries, and avoids the necessity of recalling
> witnesses who would otherwise be called upon to testify only once.

Id.;  See also United States v. Bruner, 657 F.2d 1278, 1289-90 (D.C. Cir. 1981); United States v.

Mack, 466 F.2d 333, 337 (D.C. Cir.), cert. denied, 409 U.S. 952 (1972).   Similarly, the Supreme

Court has noted that joint trials are generally preferred in order to, *inter alia*, preserve judicial

resources, produce consistent verdicts and minimize the burden on jurors, witnesses, defendants, and

attorneys.  See Buchanan v. Kentucky, 483 U.S. 402, 418 (1987).

66.     Notwithstanding, severance may sometimes be appropriate in instances where the

evidence against one defendant overwhelms the *de minimus* evidence against the co-defendant(s).

See United States v. Sampol, 636 F.2d 621 (D.C. Cir.1980) (severance granted where one defendant

charged with two murders and co-defendant charged with false declarations and misprision of

felony).  However, a showing that there is more evidence against one defendant, that there are more

charges against one defendant, or that the evidence is stronger against one defendant than against

others is insufficient to prevail on a demand for severance.  See Blumenthal v. United States, 332

U.S. 539 (1947); United States v. Perholtz, 657 F. Supp. 603 (D. D.C. 1986).   And "where

conspiracy is a dominant element and the Government must prove agreement among several

co-defendants, joinder is presumed despite the fact that the evidence may show that some defendants

were "kingpins" and others were less active."  United States v. Gray, 173 F. Supp. 2d 1, 10-11 (D. D.C. 2001)(citing United States v. Edelin,  118 F. Supp. 2d 36, 43 (D. D.C.2000) ("[S]everance is not appropriate merely because some co-conspirators were more active in the conspiracy, nor because some co-conspirators played a more central role.").  "In order to make a valid claim for severance, the defendant must show that as a result of these evidentiary disparities, there will be undue prejudice against the defendant or the jury will be unable to "compartmentalize" the evidence against the defendants."  Gray, 173 F. Supp 2d 1, at 11 (citing Zafiro v. United States, 506 U.S. 534 (1993)).

67.     Moreover in conspiracy cases especially, severance should be the rare exception rather than the rule.  "Rarely, if ever, will it be improper for co-conspirators to be tried together." United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995)(citations omitted), cert. denied, 516 U.S. 1137 (1996).  This is true even if all the conspirators are not charged in each, or all, the substantive counts.  Schaffer v. United States, 362 U.S. 511, 512-13 (1960); United States v Leach, 613 F.2d 1295, 1303 (5th Cir. 1980).  This principle applies equally in RICO prosecutions, like here, where the defendants are not charged in every predicate, or overt racketeering act, or count of the indictment.  See United States v. Caporale, 806 F.2d 1487, 1510 (11th Cir. 1986), cert. denied, 483 U.S. 1021 (1987); United States v. Persico, 621 F. Supp. 842, 850-55 (S.D.N.Y. 1985), aff'd on other grounds, 832 F.2d 705 (2d Cir. 1987).

68.     In the instance case, defendant Sorto and Osorio-Rivas move this Court for severance claiming that their roles were in essence de minimus in comparison to the roles of defendants Cordova and Gutierrez.  The defendants' arguments fail to acknowledge that the government's evidence will show that defendants Cordova and Gutierrez together with defendant Sorto were all

active members of this racketeering conspiracy and that defendant Osorio-Rivas was an active associate of the same. See Section II, *supra*. The defendants have been indicted by a Federal Grand Jury with conspiracy to commit violent crimes in furtherance of the MS-13 racketeering enterprise. In the murder of Edwin Ventura, the government's evidence will show that both men assisted in retrieving firearms for the purpose of committing a violent crime in furtherance of their MS-13 enterprise. Both defendants aided and abetted the murder committed by co-defendants Cordova and Gutierrez as both defendants Sorto and Osorio-Rivas waited inside of Osorio-Rivas white Ford Expedition in order to provide an escape for co-defendants Cordova and Gutierrez. And indeed, all defendants made good their escape on the night of the murder. As co-conspiring principals and aiders and abettors, both defendants are equally culpable for the murder of Edwin Ventura and the assault with intent to kill of Nelson Maldonado. On this evidence alone the defendants motions should be denied. See e.g. United States v. DeVillio, 983 F.2d 1185, 1192 (2nd Cir. 1993) (affirming denial of severance motion filed by two defendants charged in one burglary even though they were not charged with the RICO offenses and attempted murder committed by their co-defendants who had committed a series of other burglaries); United States v. Starret, 55 F.3d 1525, 1553-44 (11th Cir. 1995) (affirming denial of motion to sever even though strength of defendants ties to gang varied as did the number of predicate racketeering acts committed by each defendant). But the government's evidence will include further testimony from cooperating witnesses that also will expose defendants Sorto and Osorio-Rivas continuing association in the racketeering conspiracy and their particular actions in furtherance of the same. Indeed , the government's evidence intrinsic to this conspiracy, which is presently under advisement by this Court (Government's Motion to Introduce Other Crimes and Bad Acts Evidence Document Number 43), will expose defendant Sorto's other crimes and bad

acts committed in furtherance of the conspiracy.  For instance, the evidence will show that defendant

Sorto carried "La Palabra" for the MS-13 Sailors, meaning he was the clique leader.  In this role,

defendant Sorto also promoted the increased level of violence with co-defendant Cordova.  Both

defendants Sorto and Cordova participated in the "jumping-in," meaning the physical beating, of an

MS-13 recruit.  See ¶ 11, supra.  During the conspiracy, defendant Sorto continued to promote

additional violence and even committed additional violent assaults in furtherance of the conspiracy

after defendants' Cordova and Gutierrez were arrested .  See ¶¶ 15, 42, 43, and 51 supra.  It also

worth noting that during his post arrest interview, defendant Sorto admitted being a member of MS-

13 enterprise.  See ¶ 46, supra.  With respect to defendant Osorio-Rivas, the government's other

crimes and bad acts evidence will also show his association with MS-13.  A government cooperating

witness will expose that MS-13 members met at Osorio-Rivas' home during the conspiracy.  Indeed,

the government's evidence will further show defendant Osorio-Rivas association to 11th and Lamont

Streets, NW, a common area where MS-13 Sailors gathered, photographs of Osorio-Rivas displaying

the MS-13 gang signs, and his status as a recruit in the gang.  In addition, his hand written MS-13

letter found on his person when arrested on January 28, 2008, proclaiming the violence of MS-13

on the District of Columbia.  See ¶ 50, supra.  Given this evidence defendants' Sorto and Osorio-

Rivas' motion for severance should be denied.  On these facts, there is no need for an evidentiary

hearing.

##### C.    Motion for Disclosure of Government's Witnesses and Informants

69.    Defendant Sorto moves this Court to order the United States to disclose a list of

witnesses 60 days prior to trial, (see Defendant Sort Motion at Document Dumber 58), and

informants, (see Defendant Sorto Motion at Document Number 57).  These are motions are without

merit and should be denied.

70.     The government enjoys a qualified, though "time-honored," privilege to withhold the identity of its informants from criminal defendants.  <u>Roviaro v. United States</u>, 353 U.S. 53 (1957); <u>United States v. Brodie</u>, 871 F.2d 125, 128 (D.C. Cir. 1989).  In making the determination whether disclosure of a witness' identity to a defendant is necessary, the Court must balance the public's interest in law enforcement and protecting the informant's identity against the defendant's right to prepare a defense.  <u>Roviaro</u>, 353 U.S. 53, 62; <u>United States v. Warren</u>, 42 F.3d 647, 654 (D.C. Cir. 1994).  The defendant bears the heavy burden of proving that disclosure of the informant's identity is necessary and relevant to the defense.  <u>Warren</u>, 42 F.3d at 654; <u>United States v. Staufer</u>, 38 F.3d 1103, 1109 (9th Cir. 1994); <u>United States v. Khosravi</u>, 733 F. Supp. 137, 138 (D.D.C. 1990).  More specifically, the defendant must allege how the informant will help establish his or her innocence; mere conclusory or speculative pleadings will not suffice.  <u>United States v. Skeen</u>, 449 F.2d. 1066, 1071 (D.C. Cir. 1971).  Sorto offers no such specificity here; rather, he merely states in wholly conclusory  fashion, that he did not participate in the charged offenses and did not lead the clique and that, presumably, the informants would corroborate that contention.  Document 57 at paragraph 9.  The same speculation can be said of every case in which confidential informants are involved.

71.     The disclosure of the informants' names, to the extent that the defendants do not already know them, would expose the informants to danger where, as here, the government is prosecuting a violent criminal racketeering enterprise.  The informants' identities are therefore being withheld for their safety.   Courts will not order disclosure where disclosure will place an informant in personal danger and the prospective testimony is not exculpatory.  <u>United States v. Pelton</u>, 578 F.2d 701, 707-08 (8th Cir. 1978).  There is nothing exculpatory about the prospective testimony of

any informant or confidential employee, nor do the defendants even allege that any prospective testimony will be exculpatory. The government will, of course, supply defense counsel at the appropriate time with all information, if any, relevant to cross-examination of an informant, consistent with its obligations under Brady and Giglio.[24]

72.     Moreover, with respect to identities of the cooperating informants who participated in transactions with the defendants, and to the extent the defendants are not aware of the identity of those informants, their reliance on Roviaro to secure this disclosure is misplaced. Roviaro arose out of a situation in which the informant who participated in the charged offense was neither made available to the defendant nor testified at trial. See, e.g., United States v. Foster, 815 F.2d 1200, 1202-03 (8th Cir. 1987) (denial of defendant's motion to disclose informant's identity proper where informant testified at trial and was subject to cross-examination); see also United States v. Edwards, 47 F.3d 841, 843-44 (7th Cir. 1995) (no disclosure of identity required until immediately before testimony because witness faced substantial danger and defendant was not prejudiced).

73.     In addition, it is well-established that the government is under no obligation to disclose its witnesses in advance of trial in non-capital cases. See Weatherford, 429 U.S. at 559; see also Robinson v. United States, 797 A.2d 698 (D.C. 2002) (defendant not entitled name and address of single eyewitness in a homicide case). Rule 16 does nothing to alter this well-established law. [25] See United States v. White, 116 F.3d 903, 918 (D.C. Cir.) (noting that Rule 16 does not require the names and addresses of witnesses), cert. denied, 522 U.S. 960 (1997); United States v. Mitchell,

---

[24]     Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v United States, 405 U.S. 150 (1972), respectively.

[25]     Rule 16 of the Federal Rules of Criminal Procedure.

540 F.2d 1163, 1166 (3d Cir. 1976) ("The discovery rules do not permit the defense to get the names

of witnesses."); United States v. Bouye, 688 F.2d 471, 473-74 (7th Cir. 1982) ("[N]ot even under

Rule 16 is a defendant in a noncapital case entitled to lists of prospective government witnesses.").

Accordingly, for all these reasons, defendant Sorto's motions should be denied.  On these facts there

is no need for an evidentiary hearing.

> **D.      Motion for a Bill of Particulars**

74.      Defendant Sorto moves this Court to order the government to produce a bill of

particulars.  See Defendant Sorto Motion at Document Number 69.  The motion is without merit and

should be denied.

75.      Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the Court to order

the government to file a bill of particulars.  The purpose of a bill of particulars is "to ensure that the

charges brought against a defendant are stated with enough precision to allow the defendant to

understand the charges, prepare a defense, and perhaps also to be protected against retrial on the

same charges."  United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987); United States v.

Esquivel, 755 F. Supp. 434, 436 (D.D.C. 1987).  The government, however, may not be compelled

to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges,

the precise manner in which a defendant committed the crime charged, or to give a preview of its

evidence.  See United States v. Torres, 901 F.2d 205, 233-34 (2d Cir. 1990) ("[a]cquisition of

evidentiary detail is not a function of a bill of particulars"); United States v. Armocida, 515 F.2d 49,

54 (3d Cir. 1975) (bill of particulars is not intended as a vehicle for "wholesale discovery of the

Government's evidence").  Nor should the Court compel a bill of particulars to force the government

to reveal a theory of its case that the defense could then use to limit the government's presentation

of its case at trial.  United States v. Torres, 901 F.2d at 234; United States v. Burgin, 621 F.2d 1352

(5th Cir. 1980).  The constitutional right supporting a bill of particulars request is simply the right

to know the offense with which a defendant is charged, not to know the details of how it will be

proved.  United States v. Kendall, 665 F.2d 126, 135 (7th Cir. 1981).

      76.     Particularly in conspiracy cases, courts have routinely ruled that defendants do not

need detailed evidence about the conspiracy in order to adequately prepare for trial.  See, e.g.,

United States v. Jimenez, 824 F. Supp. 351, 363-34 (S.D.N.Y. 1993).  For example, courts have

consistently held that the government is under no obligation to file a bill of particulars detailing facts

regarding the existence and formation of the conspiracy.  United States v. Rosenthal, 793 F.2d 1214,

1227 (11th Cir. 1986); United States v. Deaton, 448 F. Supp. 532, 537 (N.D. Ohio 1978).  Nor is the

government required to specify every overt act of the conspiracy that it intends to prove at trial,

Wong Tai v. United States, 273 U.S. 77 (1926); United States v. Carroll, 510 F.2d 507, 509 ($2^{d}$ Cir.

1975), or to disclose exact times and locations of acts committed in furtherance of the conspiracy.

United States v. Long, 449 F.2d 288, 294-95 (8th Cir. 1971).  In United States v. Edelin, a RICO

conspiracy case, the Court denied defendants' motion for a bill of particulars and reaffirmed the

principle that "[i]t is not the function of a bill of particulars to provide a detailed disclosure of the

government's evidence in advance of trial." 128 F. Supp.2d 23, 37 (D.D.C. 2001) (quoting Overton

v. United States, 403 F.2d 444, 446 (5th Cir. 1968)).  Moreover, where extensive discovery has been

made available to defendants, a bill of particulars is unnecessary.  United States v. Eiland, 2006 WL

516743 (D.D.C. 2006).

      77.     In the instant case, defendant Sorto concedes that the government has provided all

the defendants in this racketeering conspiracy case with approximately 1,000 pages of discovery.

See Defendant Sorto's Motion for a Bill of Particulars at page 3, ¶ 7.  It is clear from his request that he is really seeking the identity of government witnesses.  Id. at pages 4-6.  Defendant Sorto is simply not entitled to that information for the reasons stated *supra*.  In sum, the combination of the government's speaking indictment, comprehensive pleadings regarding other crimes and bad acts evidence (See Document Number 43), the government's instant omnibus response, and the extensive discovery released amply provide sufficient information "to allow the defendant to understand the charges, prepare a defense, and perhaps also to be protected against retrial on the same charges." United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987).   Given this evidence defendant Sorto's motion for a bill of particular should be denied.  Further, on these facts there is no need for an evidentiary hearing.

### E.      Motion to Preserve Notes, Reports, and Evidence

78.      Defendant Gutierrez moves this Court to direct the government to preserve notes, reports, and evidence related to the case.  See Defendant Gutierrez Motion at Document Number 51.  His concern apparently is that the absent such an order the government will not comply with its obligations under the Jencks Act.[26]  His concerns are simply misplaced.  The government is well-aware of its obligations under the Jencks Act and will comply with those obligations.  There is no reason for an order from this Court given the government's obligations under the Jencks Act and Rule 16.  Accordingly, the Court should deny this motion as moot.  Further, on these facts there is no need for an evidentiary hearing.

### F.      Motion to Compel Discovery of Government Documents

79.      Defendant Cordova moves for this Court to order the government to provide him

---

[26]      Jencks Act.  18 U.S.C. § 3500(b) (1988).

with any document which describes MS-13.  See Defendant Cordova Motion at Document Number 38.  This request is overbroad to say the least and without merit.

80.     As the Court is well-aware, in criminal prosecutions, "the Brady rule, Rule 16 and the Jencks Act, exhaust the universe of discovery to which the defendant is entitled."  United States v. Presser, 844 F.2d 1275, 1286 (6th Cir. 1988); see Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987); United States v. Bagley, 473 U.S. 667, 676 (1985) ("the prosecutor is not required to deliver his entire file to a defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").  Further, while Rule 16's requirement of materiality is not a high one, the requested documents must play an important role in uncovering admissible evidence or assisting in witness preparation.  United States v. George, 786 F. Supp. 11, 13 (D.D.C. 1991).  "The law is clear that the government is not required to simply turn all its files over to a defendant.  Nor is it required to provide to the defendant evidence that is not exculpatory but is merely not inculpatory and might therefore form the groundwork for some argument in favor of the defense."  United States v. Poindexter, 727 F. Supp. 1470, 1485 (D.D.C. 1989).

81.     Here, defendant Cordova simply asks too much.  The government is not required to, nor could it "disclose any study, report, review, policy paper, information training paper" on MS-13 prepared by the Department of Justice or on its behalf.  Moreover, there are numerous reported cases on MS-13 in recent years across the country, and in local Federal jurisdictions as well, that defendant, Cordova, a self- admitted member of MS-13, is free to review with his counsel and extract whatever relevant information germane to the preparation of his defense.  For these reasons, defendant' Cordova's motion is without merit and should be denied.  Further, on these facts there is no need for an evidentiary hearing.

### G.       Motion to Disallow Testimony by Government Expert

82.    Relying primarily on United States v. Mejia, 545 F.3d 179 (2nd Cir. 2008), defendant

Cordova moves this Court to preclude expert testimony regarding the MS-13 racketeering enterprise

See Defendant Cordova Motion at Document Number 39.  The government submits that this motion

is premature because it has not yet provided expert notice to the defendants.  Notwithstanding, the

government, by way of this omnibus response and upon filing a more comprehensive notice and

motion to follow, places all the defendants on notice of its intent, pursuant to Rule 16, to call expert

witnesses in the government's case-in-chief to assist the jury in understanding the following topics

(although not limited to only these): the international and national structure, organization, hierarchy

of power, means and methods of communication, commission of violence, enforcement, loyalty,

recruitment, and unification of the MS-13 racketeering enterprise.  Despite the Second Circuit's

concerns in the Mejia case, courts have allowed expert testimony regarding MS-13 so long as the

expert is providing an independent judgment and not merely transmitting testimonial hearsay.  See,

e. g., United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010).  For these reasons, the government

moves this Court to take this motion under advisement at this juncture until such time that the

government files an additional notice of expert testimony and supporting memorandum of law.

### H.       Motion for Rule of Completeness as it Relates to Recorded Conversations and Motion to Exclude Jail Calls

83.    Defendant Gutierrez moves this Court to order the government to publish transcripts

of any recorded conversations it seeks to introduce as well as any related conversation.  See

Defendant Gutierrez Motion at Document Number 47.  Defendant Gutierrez's motion is without

merit.  Similarly, defendant Sorto moves this Court to preclude the government from admitting his

recorded telephone calls obtained from the District of Columbia Jail, or in the alternative, to order

the government to publish a list of calls and identify any calls favorable to the defense.  See Defendant Sorto's Motion at Document 55.  Defendant Sorto's Motion is equally without merit.  The government released to all defendants full un-redacted recorded communications that all defendants, including defendants Gutierrez and Sorto, have had for a substantial amount of time.  There has been ample opportunity for defendants Gutierrez and Sorto to review and produce their own translations of those conversations and identify which of those conversation are favorable to their defense.  The government has no obligation to provide the defendants with the over reaching relief they seek.  See e.g., United States v. Parks, 100 F.3d 1300 (7th Cir. 1996) (government not required to transcribe 64 hours of taped conversations that it did not intend to use at trial despite defendants' claims of lack of "meaningful access" and potential Brady when the tapes had been provided to defense counsel); see also United States v. Zavala, 839 F.2d 523, 527-28 (9th Cir. 1988) (conviction affirmed where the defense was provided with tapes for 11,000 recorded calls in Spanish, and transcripts for only the 1,800 relevant calls).  Notwithstanding, should the government elect to play any selected recorded telephone conversations of defendant Gutierrez or Sorto, or any other defendant, the government will provide transcribed and translated printed copies of only those selected conversations in ample time for the defendants to review and voice any objections.  The selected conversations would be admissible as they would be prefaced with a proper foundation with respect to the authenticity of the recordings and the identifications of the speakers, and, they would be relevant to the case as they would  expose further racketeering activity and consciousness of guilt. In addition, their probative value would outweigh any undue prejudicial effect.

I.      **Motion to Dismiss Counts of the Indictment and Motion to Preclude the Government from Admitting Racketeering Evidence**

84.     Defendant Sorto moves this Court to dismiss counts one, two, and three of the

indictment claiming that the indictment fails to allege a requisite interstate commerce connection and

that MS-13 does not constitute an "enterprise" under RICO.[27]   See Defendant Sorto Motion at

Document Number 68.  Defendant Sorto's motion is without merit and should be denied.  Similarly,

defendant Cordova moves this Court to preclude the government from admitting racketeering

evidence.  See Defendant Cordova Motion at Document Number 40.  Defendant Cordova's motion

is equally without merit and should be denied.

85.     As an initial matter, defendant Sorto's request is, at best, premature.  What defendant

Sorto is asking for is, in effect, a "kind of preliminary trial to determine the competency and

adequacy of the evidence before the grand jury."  Costello v. United States, 350 U.S. 359, 363

(1956).  This is not required by the Fifth Amendment or any other law.  Id.  The Supreme Court has

made clear that "[r]eview of facially valid indictments on such grounds would run counter to the

whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial

requires [it.]"  United States v. Williams, 504 U.S. 36, 55 (1992) (quoting Costello, 354 U.S. at 364).

86.     A RICO enterprise is defined as "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact although

not a legal entity." 18 U.S.C. § 1961(4).   In other words, the "enterprise is an entity, for present

purposes a group of persons associated together for a common purpose of engaging in a course of

conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981).  The Act encompasses not only

---

[27]     Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. §§
1961 - 1968 and also the Violent Crimes in Aid of Racketeering Activity Act (VICAR). 18
U.S.C. § 1959.

legitimate enterprises, but also criminal participation in an association that performs only illegal acts. Id. Moreover, "[t]he existence of an enterprise at all times remains a separate element that must be proved by the government." Id., 452 U.S. at 583, 101. With respect to interstate commerce, the government need only show that the enterprise, not each individual predicate act, affected interstate commerce. See 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce . . . ."). See also, United States v. Altomare, 625 F.2d 5, 8 (4th Cir.1980) ( "The government need not demonstrate that the alleged acts of racketeering themselves directly involved interstate commerce."). Additionally, the effect on interstate commerce need only be minimal. See United States v. Doherty, 867 F.2d 47, 68 (1st Cir. 1989) (and cases cited therein); United States v. Robinson, 763 F.2d 778, 781 (6th Cir. 1985); United States v. Stratton, 649 F.2d 1066, 1075 n. 12 (5th Cir.1981); United States v. Rone, 598 F.2d 564, 573 (9th Cir. 1979). Finally, this issue is not novice. Other courts have found that MS-13 is an "enterprise" under RICO and a sufficient interstate commerce connection. See, e.g., United States v. Ayala, 601 F.3d 256 (4th Cir. 2010) (affirming MS-13 convictions under VICAR); United States v. Mejia, 545 F.3d 179 (2d Cir. 2008) ("We have no difficulty in finding that the evidence was sufficient to show that MS-13 satisfied this definition."). See generally Boyle v. United States, 129 S. Ct. 2237 (2009); United States v. White, 116 F.3d 903, 924 (D.C. Cir.) (although existence of an enterprise is a separate element, the existence of an enterprise may be proved through evidence of racketeering) (internal citations omitted), cert. denied, 522 U.S. 960 (1997).

87.     In the instant case, the government's evidence will show the international and national footholds MS-13 enterprise has to local MS-13 cliques across numerous jurisdictions.

Indeed, the evidence will show that co-defendants' Cordova and Gutierrez were jumped-in to MS-13 in El Salvador and found safe-haven in Washington DC with self-admitted MS-13 member defendant Sorto.  The government's evidence will further show these members of this MS-13 conspiracy, conspired to commit, and actually committed, numerous crimes in various jurisdictions, to include international conspiratorial ties with El Salvador.  See ¶¶ 9, 15, 18-22, 23, and 40. Moreover, the crimes committed in the District of Columbia alone were committed with firearms, a jurisdiction where firearms are not manufactured, and thus affecting interstate commerce in-and-of-itself.  In addition, the government's evidence will further expose that the .40 caliber firearm used by defendant Cordova in the July 30, 2006 shooting of Dennis Diaz-Gutierrez, in Alexandria, Virginia was ballistically examined and determined to be the same firearm used by defendants Cordova and Gutierrez in the April 22, 2007, murder of Edwin Ventura and shooting of Nelson Maldonado in the District of Columbia.  In sum, the evidence will abundantly show that these MS-13 defendants were a indeed racketeering enterprise as they associated together for a common purpose and their common purpose affected interstate commerce.  For these reasons, this Court should deny defendants Sorto and Cordova's motion.  Further, on these facts there is no need for an evidentiary hearing.

88.     In addition, while a court may dismiss an indictment on such grounds as Double Jeopardy, immunity, or statute of limitations, a court may not dismiss an indictment based on a defendant's claim that the government's proof of an element of the offense is insufficient.  See, e.g., United States v. Nukida, 8 F.3d 665, 669-70 (9th Cir. 1993) (reversing dismissal based on alleged lack of interstate commerce); United States v. Means, 2008 WL 216406 (D.S.D.) (citing cases holding that an attempt to dismiss an indictment on grounds of insufficient evidence will be denied

as premature); United States v. Marcy, 777 F. Supp. 1393, 1395 (N.D. Ill. 1991) (denying motion to dismiss for alleged insufficient enterprise evidence as premature). For these additional reason, the Court should deny defendant Sorto's motion. And once again, on these facts there is no need for an evidentiary hearing.

**J.      Motions for Timely Disclosure of Impeaching Evidence and Jencks Material**

89.      Defendant Sorto moves this Court to order the government to disclose within 60 days of trial all impeaching evidence and all Jencks material within 30 days of trial. See Defendant Sorto Motion at Document Number 62. Defendant Sorto's demand is over reaching and unsupported. It should thus be denied.

90.      The government has provided extensive discovery in this case, to include Brady material. Additional Brady will be released soon. The delay of any outstanding Brady disclosures has been driven by the serious witness security concerns many of the government witnesses face. Notwithstanding, with the trial date fast approaching, the government will promptly disclose the substance of any outstanding Brady material to defense counsel. With respect to Giglio and Jencks material, the government need not disclose this material until after the witness has testified on cross-examination. See United States v. Tarantino, 846 F.2d 1384, 1414 (D.C. Cir. 1988). However, to avoid undue delays during trial, the government proposes the following trial schedule. The government proposes that this Court, as it mentioned in a recent status hearing, hold trial from Monday through Thursday; with no trial on Friday. At the end of the day on each Thursday, the government will announce its anticipated line-up of witnesses for the following week. At that time, the government will provide any Giglio and Jencks material that has not already been disclosed for the witnesses scheduled for the following week. (Of course, the witness line-up may change

depending on scheduling conflicts and events during trial).

91.     With respect to law enforcement witnesses, there is minimal, if any, outstanding Giglio/Jencks material.  With respect to civilian cooperators, as mentioned *supra*, serious security concerns will arise, more so than already existing, if their identities and expected testimony are made public in advance of trial.  In the instant case, the defendants are charged with conspiring to commit violent crimes in furtherance of their MS-13 enterprise, to include murder.  The defendants each face life without parole.  Based on the evidence recovered in this case, the defendants' MS-13 enterprise has the tools, money, resources, and motivation to interfere with the testimony of civilian cooperators.  The government submits that delaying the disclosure of information relating to civilian cooperators is necessary to minimize the potential for witness intimidation or harm.  The "Thursday" disclosure practice was approved by the court in U.S. v. Eiland, 2006 WL 516743, *8 (D.D.C. 2006) (Lamberth, J.), and U.S. v. Edelin, 128 F.Supp.2d 23, 31 (D.D.C. 2001) (Lamberth, J.).  For these reasons, defendant Sorto's motion should be denied.  Further, on these facts, there is no need for an evidentiary hearing.

### H.     Motion to Strike Alias

92.     Defendant Sorto moves this Court to strike his two aliases, "Fantasma" and "Killer" from the Indictment.  See Defendant Sorto Motion at Document Number 56.  This motion should be denied.

93.     The government is well-aware of the potential prejudice to the defendant from repetitive use of his nickname, "Killer."  See United States v. Farmer, 583 F.3d 131 (2d Cir. 2009) (affirming racketeering convictions but finding that prosecution flagrantly misused defendant's nickname, "Murder," at trial).  The government will avoid referring to the defendant by that

nickname to the extent possible.  The government will also genuinely attempt to fashion a cautionary instruction for submission to the jury if defendant Sorto so desires.  Indeed, the government's theory of the case is that, although he was an active and violent member of the MS-13 enterprise, defendant Sorto did *not* shoot Edwin Ventura or Nelson Maldonado on April 22, 2007.

94.     However, the Court should not strike his aliases from the Indictment, much less preclude the government from introducing his aliases to the jury.  First, unlike the <u>Farmer</u> case, identity is an issue in this case.  <u>Id.</u> at 146.  Second, multiple witnesses will testify about the defendant.  Some of these witnesses know defendant Sorto only by the alias "Killer."  Other witnesses know defendant Sorto only by the alias "Fantasma."  Other witnesses know defendant Sorto only by both aliases.  And, other witnesses know defendant Sorto by both aliases and by his first name "Melvin."  Accordingly, defendant Sorto's identification will be established by a combination of all three types of witnesses who know defendant Sorto by varying names and who will expose his criminal conduct in the MS-13 enterprise.   While the government is willing to work out an acceptable limiting instruction (an instruction similar to the standard Rule 404(b) instruction) and the government is willing to not flagrantly misuse his nickname in the presence of the jury, this Court should not strike defendant Sorto's aliases from the Indictment or preclude the government from presenting his aliases to the jury.  Doing so would place an unfair burden on the government to establish defendant Sorto's identity with witnesses who only know him by his aliases.  <u>See</u> e.g. <u>Farmer</u>, *supra*, at 146, n. 7 (citing <u>United States v. Hattaway</u>, 740 F.2d 1419, 1425 (7th Cir. 1984) (holding that witness's use of gang nicknames was permissible where gang members used nicknames in witness's presence and "forbidding [the witness] from using the[]names would have placed an undue burden on her testimony").  For these reasons, defendant Sorto's motion should be denied.

Further, on these facts there is no need for a hearing.

**I.      Motion for Appointment of Additional Defense Counsel**

95.      Relying entirely on <u>United States v. Boone</u>, 245 F.3d 352 (4th Cir. 2001), defendant

Sorto moves this Court for the appointment of a second counsel.  <u>See</u> Defendant Sorto's Motion at

Document Number 61.  The government does not oppose this motion.  But as defendant Sorto points

out in his motion, the Fourth Circuit is <u>alone</u> in holding that a defendant charged with a capital

offense is entitled to two counsel even if the government is not seeking the death penalty.  <u>See</u> <u>e.g.</u>,

<u>United States v. Douglas</u>, 525 F.2d 225, 235-37 (2nd Cir. 2008) (noting that no other circuit has

followed the Fourth Circuit's position).  The government submits to this Court, that other Federal

Circuits have correctly decided this issue contrary to the Fourth Circuit's decision in <u>Boone</u>.

Notwithstanding, with respect to this motion, the government does not oppose the defendant's

motion and will defer to this Court's discretion.

**K.      Motion for Admission of Rule 609 Convictions**

96.      Defendant Gutierrez moves this Court for an order permitting him to introduce prior

convictions of government witnesses, even those that "exceed the limitations period described at

Federal Rule of Evidence 609(b)."  <u>See</u> Defendant Gutierrez's Motion at Document Number 45.

Defendant Gutierrez's motion is, at this juncture, premature and over reaching.  As such, at this time,

this Court should take defendant's Gutierrez's motion under advisement.

97.      Rule 609 states in relevant part:

(1) evidence that a witness other than an accused has been convicted of a crime shall
be admitted, subject to Rule 403, if the crime was punishable by death or
imprisonment in excess of one year under the law under which the witness was
convicted, and evidence that an accused has been convicted of such a crime shall be
admitted if the court determines that the probative value of admitting this evidence

outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness

98.     Notwithstanding, Rule 609(b) also restricts the admissibility of prior conviction evidence to impeach a witness if ten years have elapsed since the later of the witness' conviction or his release from confinement resulting from the conviction. See Fed. R. Evid. 609(b).  As part of the Rule 609(b) time calculation, two important dates must be considered: (1) for the purposes of determining whether a conviction is more than ten years old, the question is whether ten years has expired at the time the witness testifies at trial . . .  and (2) under the rule, "release of the witness from confinement" means at the end of imprisonment, not the termination of a period of probation . . . . " United States v. Pettiford, 238 F.R.D. 33, 37 (D.D.C.2006) (citations omitted).   If, a trial court decides that the evidence's probative value outweighs its prejudicial effect, the court may allow it to be presented. Id.  However, the proponent of Rule 609(b) evidence over ten years old must give the adverse party "sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." Id.

99.     In the instant case, the government reserves the right to contest any prior conviction of any government witness that fails to meet the qualifications proscribed in Federal Rule 609, particularly any conviction beyond 10 years old, and any prior convictions that fail to satisfy a Rule 403 probative value versus prejudicial effect analysis.  For these reasons, defendant Gutierrez's motion should be taken under advisement at this time.

L.     **Motion for Rule 404(b) Notice**

100.     Defendant Gutierrez moves this Court for an Order directing the government to

provide notice, pursuant to Federal Rule of Evidence 404, of its intent to introduce other crimes and

bad acts evidence.  See Defendant Gutierrez Motion at Document 44.  Defendant Gutierrez's motion

is moot and should therefore be denied.  On May 3, 2010, the government filed its Notice and

Motion to Introduce Other Crimes and Bad Acts Evidence.  See Document 43.  As such, defendant

Gutierrez's motion should be denied.

### M.     Motion for Production of Summary Charts Prior to Trial

101.     Defendant Gutierrez moves this Court to order the government to produce summary

charts prior to trial.  See Defendant Gutierrez Motion at Document Number 48.  Defendant

Gutierrez's motion is premature.

102.     Notwithstanding, the government, by way of this omnibus motion and a supplemental

notice and motion to follow, gives notice to all defendants of its intent, pursuant to Federal Rules

of Evidence 611(a) and 1006, to introduce summary charts at trial to assist the jury.  Pursuant to rule

611, trial judges have broad discretion in the manner in which they allow the examination of

witnesses to be conducted.  The admission of demonstrative exhibits is clearly governed by the

sound discretion of the trial court, and evidentiary rulings regarding such evidence will be reviewed

under an abuse of discretion standard.  See, e.g., United States v. Aldaco, 201 F.3d 979, 986 (7th Cir.

2000) (replica of destroyed shotgun); United States v. McIntosh, 23 F.3d 1454, 1456-57 (8th Cir.

1994) (demonstrative revolver);  United States v. Baker, 10 F.3d 1374, 1411-13 (9th Cir.

1993)(summary charts as to value of drugs); United States v. Paulino, 935 F.2d 739, 753 (6th Cir.

1991) (organizational chart); United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (summary

chart); United States v. Scales, 594 F.2d 558, 563-64 (6th Cir. 1979) (testimonial summary chart).

Generally speaking, there are two types of summary charts recognized by the law of evidence: charts which purport to summarize or show the relationship between (that is, "tie together") other evidence admitted during the trial. This type of chart is demonstrative evidence and its admissibility and accuracy is dependent on the admission in evidence and accuracy of the other evidence it purports to summarize. These charts are governed by Rule 611(a). There also summary charts of voluminous records offered in evidence under Rule 1006. Under Rule 1006, this type of summary chart constitutes substantive evidence and its admissibility is not dependent on the admission in evidence of the underlying records. See generally United States v. Bray, 139 F.3d 1104, 1111-12 (6th Cir. 1998); United States v. Johnson, 54 F.3d 1150, 1157-61 (4th Cir. 1995); United States v. Blackwell, 954 F. Supp. 944, 971-73 (D.N.J. 1997).

103.    In the instant case, should the government seek to admit either type of charts, the government will provide the charts to the defendants in ample time for them to voice any objections. As such,  defendant Gutierrez's motion should be denied at this time.

### N.    Motion to Sequester Witnesses

104.    Defendant Gutierrez moves this Court for an order directing the sequestration of witnesses at trial.  See Defendant Gutierrez's Motion at Document Number 49.  Defendant Gutierrez's motion is, in part, over reaching and should be denied in part.  The government appreciates the Federal Rule of Evidence 615 on Exclusion of Witnesses and will comply with this Court's order regarding the same.  To the extent defendant Gutierrez seeks relief within the parameters of Rule 615, the government has no objection and we move this Court to apply the rule equally to the defendants as well.  With respect to any other relief on the sequestration of witnesses that defendant Gutierrez seeks falling outside the parameters of Rule 615, the government objects

and moves this Court to deny them.

### O.    Motion for Disclosure of Movement

105.    Defendant Gutierrez moves this Court for an order directing the government to release to the defense a United States Marshal Service Form (USMS) 129 indicating the movements of any prisoner witness the government intends to call at trial.  See Defendant Gutierrez Motion at Document Number 50.  Defendant Gutierrez's motion should be denied.

106.    The defense is not entitled to a release of a USMS 129 at this time.  Such a release would identify the prisoner witnesses the government intends to call at trial and would place them at serious risk of harm.  Defendant Gutierrez's motion is an attempt to identity, at an early juncture, the names of the government's prisoner witnesses and manufacture a "collusion" defense.  That is, advancing a defense that because prisoners may have been housed together in a detention facility then they would have colluded together against the defendants standing trial.  At best, material that would support this defense would be impeachment material and it would be released prior to the prisoner witness being called as a witness.  Should the government seek to introduce the testimony of any prisoner witness, appropriate prisoner movements logs will be released in the manner proposed by the government in Subsection III-J, *supra*.  For these reasons, defendant Gutierrez's motion should be denied at this time.

### P.    Motion to Adopt Co-Defendants Motions

107.    Defendants Cordova and Gutierrez move this Court to allow them to adopt the motions filed by their co-defendants.  See Cordova Motion at Document Number 42 and Gutierrez Motion at Document Number 52.  The Government does not object to the parties adopting the motions of their co-defendants assuming they are similarly situated.  However, the government does

not agree to that practice in circumstances where only one party has standing to raise a claim while the others do not.

**IV.    Conclusion**.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that this Court, where applicable, enter Orders denying the defendants motions.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

_____/s/_____
NIHAR R. MOHANTY
555 Fourth Street, N.W., Room 4120
Washington, D.C. 20530
(202) 514-7395
nihar.mohanty@usdoj.gov (email)

_____/s/_____
GILBERTO GUERRERO, JR.
Assistant United States Attorney
KS Bar No. 19271
Organized Crime and Narcotics Trafficking Section
555 4th Street, N.W., Room 4814
Washington, D.C. 20530
(202) 514-7298 (desk)
gilberto.guerrero@usdoj.gov (email)

CERTIFICATE OF SERVICE

I hereby certify that, on the 4th day of June, 2010, a copy of the foregoing Government's Omnibus Response to Defendants Pre-trial Motions was served by electronic mail on all defense counsel.

_____/s/_____
GILBERTO GUERRERO, JR.
Assistant United States Attorney